HBDsMED1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ELY MEDINA, et al.,

                    Plaintiffs,

          v.                          16 Civ. 869 (JCG)

EAST COMMUNICATION, INC.
d/b/a EAST COMMUNICATION, INC.,
JAMES PARK, and LUIS G. YO,

                    Defendants.

------------------------------x
                                    New York, N.Y.
                                    November 13, 2017
                                    10:00 a.m.

Before:

                    HON. JENNIFER CHOE-GROVES,

                              Judge (sitting by designation)

                         APPEARANCES

MICHAEL FAILLACE & ASSOCIATES, P.C.
     Attorneys for Plaintiffs
BY:  JOSHUA S. ANDROPHY
     SARA J. ISAACSON

KAPLAN & CHUN, P.C.
     Attorneys for Defendants
BY:  HOWARD CHUN

HBDsMED1

1          (Case called)

2          MS. ISAACSON:  Good morning, your Honor.  Sara

3     Isaacson from Michael Faillace & Associates for the plaintiff,

4     Ely Medina.

5          MR. ANDROPHY:  Joshua Androphy of Michael Faillace &

6     Associates, P.C., also for the plaintiff, Ely Medina.

7          THE COURT:  Good morning.

8          MR. CHUN:  Good morning.  For the defendant, Kaplan &

9     Chun, Howard Chun.  With me is one of the defendants, Mr. James

10    Park.

11         THE COURT:  Good morning.  Thank you, everyone, for

12    arriving on time and for coming at a different time that we let

13    you know about at the last minute.

14         We are here today for a bench trial.  Have there been

15    any further discussions on settlement, or are we still moving

16    forward with a trial today?

17         MS. ISAACSON:  Your Honor, there were some

18    discussions, but the parties are ready to move forward with

19    trial.

20         THE COURT:  Would the parties like to make brief

21    opening statements?

22         MS. ISAACSON:  Yes, your Honor.

23         THE COURT:  OK.  Plaintiff.

24         MS. ISAACSON:  Your Honor, this is, from our

25    perspective, a very basic Fair Labor Standards Act and New York

HBDsMED1

1   Labor Law case where the plaintiff is alleging that the

2   defendants failed to pay him minimum wage and overtime.

3            Since it was passed in 1988, the Fair Labor Standards

4   Act has stood for our country's commitment to paying workers

5   the minimum wage and for paying workers overtime for brutal

6   hours worked and to ensure that workers are protected who might

7   otherwise be exploited.  The law does so by imposing strict

8   requirements on employers as to how much they have to pay the

9   workers and by requiring that they record exactly how they are

10  complying with the law.

11           Today you're going to hear from the plaintiff about

12  the long hours that he worked at East Communication.  East

13  Communication is a mobile phone store that felt it didn't need

14  to comply with the law.  The plaintiff is going to paint a

15  picture for you about how they just utterly failed to comply

16  with the Fair Labor Standards Act and New York Labor Law.  Each

17  time that he was paid, he was never given a pay stub containing

18  New York Labor Law required information.  Additionally, the

19  defendants never gave him a notice containing important aspects

20  about his pay, as required under the New York Labor Law.

21           You will also hear from the plaintiff about the long

22  hours that he worked and how he was never paid overtime.  You

23  will also hear just, essentially, that they completely failed

24  to comply with the Fair Labor Standards Act and New York Labor

25  Law.  Accordingly, you will find that the defendants are

HBDsMED1

 1   liable.

 2            THE COURT:  Thank you.

 3            Defense counsel, would you like to make an opening

 4   statement?

 5            MR. CHUN:  Yes, your Honor.

 6            We also share in the same sediment that this is

 7   going to be an easy case.  We have a plaintiff who we believe

 8   actually requested payments to be made in cash on an

 9   agreed-upon amount of $9 an hour and the hours worked.  The

10   method of payment that you will hear was paid in cash.

11            Mr. Medina, we believe, every week was supposed to

12   report and tell exactly the person how much he was supposed to

13   get paid.  He got paid right on the spot.  If he never got paid

14   more for overtime it's because he never worked overtime.  He

15   worked ten hours.  The shift is ten hours, from 10:00 a.m. to

16   8:00 p.m.  That includes payment for lunch.  So my clients,

17   they require him to be there for ten hours.  What he is going

18   to do there for the ten hours, they hope he is working.  He

19   gets paid for the entire ten hours that he is there.  We

20   believe that it is, in fact, clear cut.  He was paid for all

21   the time that he worked.  Whatever he requested, he was paid.

22            Thank you.

23            THE COURT:  Are there any stipulations as to exhibits?

24            MS. ISAACSON:  No, your Honor.

25            MR. CHUN:  No.

HBDsMED1

1          THE COURT:  I received exhibits in advance from the

2    plaintiff.  I did not receive any exhibits from the defendant.

3          Does the defendant plan to have any exhibits today?

4          MR. CHUN:  No.

5          THE COURT:  Who do we expect testimony from?

6          MS. ISAACSON:  We will be calling the plaintiff, Ely

7    Medina, your Honor.

8          THE COURT:  How about for the defendant?

9          MR. CHUN:  Mr. James Park, and we have a witness that

10   is not here yet, but she can't be in the room anyway,

11   Ms. Flores.

12         THE COURT:  Who is Ms. Flores?

13         MR. CHUN:  She is an employee of East Communication,

14   Inc., and she was the one that actually gave Mr. Medina the

15   cash payments.

16         THE COURT:  I'm sorry, I didn't hear you.  The cash?

17         MR. CHUN:  Payments.

18         THE COURT:  Payments.

19         MR. CHUN:  Yes.  She was the one responsible to

20   actually give him the money.

21         THE COURT:  I would like to clarify the time frame

22   that is at issue in this case.  Could you please specifically

23   tell the court what dates are at issue?

24         MS. ISAACSON:  Your Honor, it begins in February 2015

25   until the end of November 2015, beginning of December 2015.

1        THE COURT:  How long do the parties expect that the

2   trial will take, in your best estimate?

3        MS. ISAACSON:  We believe a few hours, two or three

4   hours, your Honor.

5        THE COURT:  Defense counsel, what do you think you

6   will need?

7        MR. CHUN:  If we go until five o'clock, if that is

8   what time the courts close, I believe we can finish by then.

9        THE COURT:  OK.  No longer than one day.  You think we

10  can finish today, both of you?

11       MR. CHUN:  It depends on what they say, too, because I

12  might have a rebuttal witness that is not one of the two people

13  that I mentioned.

14       THE COURT:  OK.  Plaintiff, would you like to call

15  your first witness?

16       MS. ISAACSON:  Yes, your Honor.  The plaintiff would

17  like to call the plaintiff himself, Ely Medina.

18   ELY MEDINA,

19       called as a witness by the Plaintiffs,

20       having been duly sworn, testified as follows:

21       THE COURT:  Good morning, Mr. Medina.  Welcome.

22       THE WITNESS:  Good morning.

23  DIRECT EXAMINATION

24  BY MS. ISAACSON:

25  Q.  Good morning, Mr. Medina.  Did you ever work at a place

HBDsMED1                     Medina - direct

1    called East Communication, Inc.?

2    A.  Yes, I did.

3    Q.  What kind of business is East Communication, Inc.?

4    A.  They sell cell phones, and he @measures under the Metro PCS

5    brand.

6    Q.  What kind of items does East Communications offer for sale?

7    A.  They have a variety of different plans provided by Metro

8    PCS, as well as phones and accessories.

9    Q.  Where is it located?

10   A.  It is located in the Bronx, New York.  1452 East Avenue in

11   Bronx, New York.

12   Q.  When did you begin work at East Communication?

13   A.  Approximately February, either the 20th or the 21st, 2015.

14   Q.  When did you stop working at East Communication, Inc.?

15   A.  Approximately the end of November, maybe beginning of

16   December 2015.

17   Q.  Between February 2015 and the end of November 2015 or

18   beginning of December 2015, did you take any vacations while

19   you were working at East Communications?

20   A.  No.

21   Q.  What did you do at East Communication, Inc.?

22   A.  Well, by title, I was just a sales associate, but you could

23   say my responsibilities were that almost of management, as I

24   had to open the store in a timely fashion, get the store ready

25   for business, and then just perform daily transactions, such as

1   bill payments, purchases, phone upgrades, accessory sales, all

2   those things of that matter.

3   Q.  Did you do anything else for East Communication, Inc.?

4   A.  From time to time, I was requested by Mr. Park to do -- I'm

5   sorry -- deposits in both Chase and TD Bank when they were

6   unable to make them.

7   Q.  Who was in charge of East Communication?

8   A.  To my knowledge, Mr. James Park and Luis Yo.

9   Q.  Who set your schedules while you worked at East

10  Communication?

11  A.  For the most part, Mr. James Park, but from time to time

12  Mr. Park was not available.  I would have communication with

13  Mr. Luis.

14  Q.  Who paid you while you worked at East Communication?

15  A.  Mr. James Park paid me.  When we sat down, we would

16  calculate hours worked, and we would go off of that.  And he

17  would pay me in cash from the register, I might add.

18  Q.  What you was your schedule when you started working at

19  East Communication?

20  A.  My schedule was full-time hours, but many times I worked

21  over the 40 typical hours worked.

22  Q.  What were the typical hours worked?

23  A.  Well, the store business hours are from ten to eight p.m.

24  from Monday to Saturday, and Sundays, I believe it is 12 to

25  five or 12 to six.  And you could say I usually had one day

HBDsMED1                    Medina - direct

1   off.  So I was working about six days a week, pretty much in

2   the store by myself from opening to close.

3   Q.  Did you ever arrive before open and close time of the

4   store?

5   A.  Well, of course, because in order for the store to be open

6   on time at ten a.m., you have to arrive, you know, around 9:30,

7   9:15, because it was my responsibility to unlock the gate,

8   raise the gate, which by the way is a manual gate, and then

9   open the store, put in the alarm code, turn the computer on,

10  you know, typical stuff to get the store running.  So yes, in

11  order to open the store by ten, I would have to arrive

12  previously and -- yeah.

13  Q.  Did you ever leave after the store closed?

14  A.  Yes.  Unfortunately, because it is a prepaid store.

15  Because, like, to pay in cash, they like to pay their bill

16  payments in cash, sometimes they might just need a last minute

17  phone.  Although it was my responsibility to close around 7:59

18  or eight p.m., there was many times where it was that time and

19  there was, you know, more customers in the store.  And I would

20  stay and make sure the transactions were completed, and

21  sometimes I would close 8:30, maybe nine o'clock.  And then the

22  store is closed to the public, but you still have to do the

23  end-of-day duties, for example, cashing out, making sure there

24  is 150 left in the register, and saving the deposit that needs

25  to be done for the next day.  And sometimes some cleaning of

HBDsMED1                         Medina - direct

1   the store, trash, and basic things like that.  Not to mention,

2   closing the actual store, putting the alarm code, taking the

3   gate down, and all those things.

4   Q.  When you used to arrive to this store before it opened,

5   around what time was that?

6   A.  Usually around 9:30, sometimes earlier, depending on, like,

7   if I felt it was going to be a busy day.  I actually like to

8   start a little earlier to try to get some sales and be able to

9   possibly leave on time rather than later.

10  Q.  Did your schedule ever change at any point while you worked

11  at East Communication?

12  A.  It changed towards the end when we started to have some

13  disagreements on payment, but other than that, it was pretty

14  stable.

15  Q.  Describe what you did when you opened the store each day.

16  A.  OK.  As I believe I mentioned before each day, I would get

17  to the store, obviously I took public transaction, and there

18  was a lock on the gate.  You take the lock off, raise the gate

19  manually -- it was not an electrical gate -- and then I would

20  put the key in the door, open the door.  There was an alarm

21  panel, I believe, on the left -- right side of the door, put

22  the alarm code in, deactivate the alarm, walk to the computer

23  terminal, turn them on, log in.  There was some log-ins to log

24  into, like, bill payments and processing systems.  I believe

25  one of them is called ASAP.  I don't know if that has changed.

HBDsMED1                        Medina - direct

```
 1  And then once all that was set up, then I would turn the lights

 2  on, because I would like to keep them off because most of the

 3  times there was actually customers outside waiting because,

 4  again, this is a place where a lot of people pay their bills in

 5  cash and people are on their way to work, whatever it may be.

 6  They wanted to get into the store as quickly as possible.  I

 7  would turn the lights on, open the door, and get -- you know,

 8  do business.

 9  Q.  Can you describe what you did when you closed the store?

10  A.  Closing the store, pretty much the opposite of what I've

11  just described, you know, cash out, which means count all the

12  money in the register, separate the money that is going to be

13  deposited, leave 150 for the next day flow, and close and turn

14  off all the computer systems, put the alarm on, lock the door,

15  close the gate, put the lock on, and proceed to go home.

16  Q.  I would like to show the witness Plaintiff's Exhibit 4.  Do

17  you recognize this video?

18  A.  I do.

19  Q.  What is this a video of?

20  A.  I believe I was closing at the time to go to lunch, because

21  unfortunately, as I mentioned before, most of the time I was

22  working the store by myself.  If you notice closely on the

23  door, I believe there is a sign saying something to the aspect

24  that I'll be back in a few minutes, out to lunch.

25  Q.  What did you use to close this door?
```

HBDsMED1                          Medina - direct

1   A.  There was a key provided to me by the owner to be able to

2   close the store.  As you will notice, there is the lock as well

3   that I used to open and close the store.  It is actually placed

4   on there.

5   Q.  I would like to admit Plaintiff's Exhibit 4 into evidence.

6   Was there any sort of time system at East Communication to

7   record when you came in in the morning?

8   A.  There was, but most of the time it was not functional, or

9   when it was, it wouldn't function properly, like, I had issues

10  logging in and out of it, clocking in and out, so yeah.

11  Q.  Where was the time system?

12  A.  It was just on a computer terminal.  There was no, like,

13  fingerprint reader or any kind of really secure system.  You

14  just kind of would click a button and it would say, OK, you're

15  clocked in or you're clocked out.  In order for it to know who

16  you were, you just kind of selected your name from, like, a

17  list of names inside the database, I guess.

18  Q.  How long after you arrived at the store were you able to

19  punch in through the time clock when it was working?

20  A.  As I said, obviously the computers are inside towards the

21  back.  As you probably could tell in the video, it's not a huge

22  store, but I do have a disability, so it does take me a little

23  bit longer to move around than others.  So I would say about 15

24  to 20 minutes while the computers would have been on, all those

25  kinds of things.

HBDsMED1                          Medina - direct

1    Q.  Was there any type of communications to be recorded when

2    you left work at the end of the day?

3    A.  Not to my knowledge.  I guess you could say maybe if there

4    is a some kind of system that would notify the owner when I put

5    the code into the alarm in and out, but that's technically not

6    a clocking-in system.

7    Q.  Did you use the time system at East Communication to punch

8    in and out every day that you worked there?

9    A.  I did not use it every day.  I attempted to use it, but

10   many times it would fail.  I would not keep it.  Rather,

11   actually, most of the time, I kept my own records of the times

12   that I stepped into the store and left.

13   Q.  I would like to show the witness Plaintiff's Exhibit 5.

14          THE COURT:  OK.

15   Q.  Do you recognize this document?

16   A.  No, I don't think I ever seen this before.

17   Q.  Do you know what this document is?

18   A.  It seems to be some kind of printout of a time sheet,

19   according to what it states on the paper, and it does have my

20   information as an employee, as well as the license number and

21   the Metro PCS brand.

22   Q.  OK.  Take a moment to review the dates and times on the

23   document.  Do these appear to accurately reflect the dates and

24   times that you worked at East Communication?

25   A.  I mean, there is a lot of times here, but just from

HBDsMED1                          Medina - direct

1    overlooking it, I can tell there is a lot of inaccuracies,

2    although some of them do seem accurate.  As I mentioned before,

3    I did use it from time to time.  There are many that are either

4    not put into the system or absolutely incorrect.

5    Q.  What is an example of one that looks accurate?

6    A.  Let's see here.  For example, March 31st to March 31st, so

7    in the beginning at 9:52 a.m. and eight seconds and ending

8    8:12 p.m. and 49 seconds on the 31st of March.

9    Q.  Are there any examples that you see that don't look

10   accurate?

11   A.  Yeah, many, but let me just look for one specifically.

12   Let me see here.  For example, on March 26, it claims that I

13   clocked in at 10:35 a.m. and 31 seconds, but then there is no

14   clock-out time.  And the next clock in or clock out, I'm not

15   sure what that is, was on March 26 at 11:59 p.m., which

16   obviously I don't believe I was at the store at that time.

17   Q.  OK.  Did East Communication require you to write in the

18   times you would arrive to work and leave work?

19   A.  I don't believe it was a requirement.  As I -- as I

20   mentioned before, I kept my own records in order for payment,

21   because I was aware that the system did not work properly, but

22   I don't ever recall signing any documents or coming to an

23   agreement stating that I needed to keep track of my own times

24   in order to be able to get paid properly.

25   Q.  Why did you write in the times you would arrive to work and

HBDsMED1                      Medina - direct

1   leave work?

2   A.  As I just mentioned, I was aware that the system did not

3   work properly, and I felt compelled to look after my well-being

4   and make sure that I was paid what I worked.

5   Q.  Did you write down that information from the start of your

6   time working at East Communication?

7   A.  On and off.  You know, unfortunately, for some time, I

8   didn't really take it too serious because towards the

9   beginning, my pay was accurate, not including the overtime.

10  But towards the end, we started having some disagreements as

11  far as hours that I had worked total, so since I hadn't been

12  diligent, I started to do so around September.  I kept track

13  very diligently of the hours worked at that time.

14  Q.  That's September 2015?

15  A.  Yes.

16          MS. ISAACSON:  I would like to show the witness

17  Plaintiff's Exhibit 6.

18          THE COURT:  OK.

19  Q.  Do you recognize this document?

20  A.  Yes, I do.  This is -- well, this is a copy of a journal or

21  small book that I started to jot down days and amounts of hours

22  worked, like I said before, starting in September.  According

23  to this document, September 1st, 2015.

24  Q.  Did you record the total number of hours you worked each

25  day?

HBDsMED1                    Medina - direct

1   A.  That's correct.  I didn't quite put the times because, like

2   I said, they fluctuated.  I would rather just put the amount of

3   hours so that when I was going to get paid, it would be easier

4   to add up total hours and say, hey, this is how much hours I

5   worked, you owe me X amount, based on my calculation.

6   Q.  Can you turn to the fifth page of this document?

7   A.  Is that the final page?

8   Q.  It's the second to last page.

9   A.  What is the date on the page?

10  Q.  I'm sorry?

11  A.  What are the dates on the page?  I want to make sure I'm

12  correct.

13  Q.  The top of the page says 10/26/15.

14  A.  OK.  Thank you.

15  Q.  Can you explain what the records on the bottom of the page

16  are?

17  A.  So that was my attempt, again, to keep track of amounts

18  paid.  Now, you may notice that some of them are out of order.

19  That's, again, because I was keeping track to my own account.

20  This is not something I had done previously.  Normally there

21  are systems in place where the employer kind of allows you to

22  keep track of it digitally or on some kind of document, but

23  because I was also trying to be fair to those who I had worked

24  for, there was some times and dates here that I said, OK, he

25  paid me X amount, but some of them I missed.  When I was

HBDsMED1                      Medina - direct

1    calculating the amount that I hadn't been paid, I actually went

2    through text messages and old e-mails and said, oh, he did pay

3    me X amount.  For example, here, where it says 10:30:15,

4    300 hours, that is what I was paid on that date.  But then it

5    goes out of order and I put September 28, 2015, 3:15.  Then I

6    put a note next to it, travel, which I believe that meant that

7    he had traveled and maybe Mr. Luis had paid me, that is why I

8    had no record.  But after looking through some messages, I

9    found that I had been paid, so we came to an agreement that

10   that money was not owed.

11             MS. ISAACSON:  I would like to admit this into

12   evidence as Plaintiff's Exhibit 6.

13             THE COURT:  OK.  Any objection?

14             MR. CHUN:  No objection.

15             THE COURT:  It's accepted into evidence.

16             (Plaintiff's Exhibit 6 received in evidence)

17   BY MS. ISAACSON:

18   Q.  Did you ever work over your schedule of hours?

19   A.  Yes, very often.

20   Q.  Did you receive breaks when you worked?

21   A.  From time to time, as you saw in the video, I would, with

22   authorization, close the store to take a 30-minute lunch break,

23   but very often, if the store was busy, I was not able to do

24   that because there was no other employee.  So, therefore, I

25   would either order take-out or delivery and eat while working,

HBDsMED1                          Medina - direct

1    or sometimes not even eat because it was just that busy and I

2    felt obliged to fulfill my duty as the sales associate.

3    Q.   How much were you paid initially at East Communication?

4    A.   I believe it was about $9 an hour.

5    Q.   Did your pay ever change at any point during your

6    employment?

7    A.   Not to my knowledge.

8    Q.   Did you ever work more than 40 hours in a week?

9    A.   Yes.

10   Q.   What were you paid for the hours you worked over?

11   A.   Still $9 an hour.

12   Q.   Did anyone at East Communication ever discuss overtime pay

13   with you?

14   A.   I don't think so, just that there wasn't going to be given

15   because the fact that they were paying me in cash.

16   Q.   How often were you paid?

17   A.   I was supposed to be paid weekly, but as I said, although

18   we started off correctly and it did -- we would calculate, oh,

19   you worked 40 hours, 45 hours times nine, it is X amount.  As

20   time went by, they started to be negligent as far as payment,

21   and they would only give me one week or a week and a half, but

22   not the full two weeks, or whatever was owed at the time.

23   Q.   Were you paid for all of the hours that you worked at East

24   Communication?

25   A.   I don't believe so.

HBDsMED1                     Medina - direct

1   Q.  How many hours were you not paid for?

2   A.  I mean, I couldn't tell you off the top of my head, but

3   approximately ten hours, give or take.  Not ten hours total,

4   but for per week worked.  So let's say if I worked a total of,

5   I don't know, 10 or 20 weeks.  I don't know what the total is

6   off the top of my head.  If you multiply that by ten, maybe

7   100 hours.

8   Q.  Were you paid by cash or check?

9   A.  Cash always.

10  Q.  Who paid you at East Communication?

11  A.  Mr. James Park.

12  Q.  Were you ever given any kind of document with your pay?

13  A.  Not to my knowledge.

14  Q.  Were you ever given any kind of document explaining what

15  your rate of pay was?

16  A.  No.

17  Q.  You testified earlier that you worked as a representative,

18  correct?

19  A.  That is correct.

20  Q.  During a typical day at East Communication, would you do

21  anything for the mobile phone store other than make sales?

22  A.  Yes.  As I mentioned before, it was my responsibility to

23  open and close the store when I was not scheduled to work, as

24  well as do deposits when instructed to do so by either

25  Mr. Park, Luis Yo, or Ms. Colonie, who I don't believe is here

HBDsMED1                          Medina - direct

1    today.

2    Q.   How much cash would you typically deposit when you were

3    instructed to do so?

4    A.   It would vary depending on if the deposits had been done

5    the days prior or how much was, you know, produced overall.

6    But on the low end, maybe $500.  On the high end, if we had a

7    good day the day before or if there was many days that hadn't

8    been deposited for one reason or the other, in the thousands,

9    3,000, 4,000.  I would even dare to say maybe 5,000, if it was

10   a busy time.

11   Q.   How much sales per day would there be from credit and debit

12   cards?

13   A.   Again, that is something that varies because it is mainly a

14   prepaid store.  Most people that come into the store actually

15   do it because they want to pay in cash, and those who want to

16   pay by credit or debit usually do transactions either over the

17   phone or online.  But it did happen from time to time, mostly

18   debit transactions.  I would say about maybe 300 at the most,

19   maybe 1,000, if a person is buying an expensive phone in the

20   store with a debit or credit card.  On average, between three

21   to $500.

22   Q.   Are you familiar with any other store?

23   A.   Yes.  Actually, I believe they owned one in Poughkeepsie on

24   Main Street and one somewhere in New Jersey or Pennsylvania.  I

25   don't know the exact address.

HBDsMED1                        Medina - direct

1    Q.  What were your dealings with the Poughkeepsie store?

2    A.  Well, as they mentioned earlier, Colonie was the employee

3    there, and if either Mr. Park or Luis was unavailable and I

4    needed existence in something or if I needed to get a product

5    that was not in stock in the Bronx, New York store, I would

6    call her, as well as the other employee in the New

7    Jersey/Pennsylvania store, and say, hey, I need two or three

8    cases for X phone, or I need X phone because we're out of

9    stock, can you have someone bring it.  That was pretty much the

10   dealings.

11           Very rarely, again, only if Mr. James Park or Luis

12   were not available, she might say, hey, don't forget you're

13   scheduled to work X day and things like that, but not often.

14   Q.  How often did these happenings with the Poughkeepsie store

15   occur?

16   A.  That was actually a very normal occurrence.  We were very

17   frequently moving products from one store to the other because,

18   you know, it is a small business.  So sometimes it is hard to

19   judge what people want to buy.  We would kind of try to buy

20   different products while -- I don't want to say "we."

21   Sometimes we did speak about, you know, what products are

22   needed.  When me and Colonie would speak about that or

23   Mr. Park, we would try to get different products for both

24   stores so that we could kind of interchange as needed.

25           (Pause)

HBDsMED1                    Medina - direct

1  Q.  You mentioned earlier that you were not paid for

2  approximately ten hours every week.  How many hours did you

3  typically work each week?

4  A.  Well, again, these are approximate, because as you saw from

5  my records, unfortunately, for my own disadvantage, I only

6  started keeping records accurately from September.  But I would

7  calculate estimates of 45 to 55 hours of which I was only paid

8  $9 an hour per hour.

9  Q.  Is the 45 to 55 hours how many hours you worked or how many

10  you were paid for?

11  A.  No.  It is only how many I worked for.  Normally, I was

12  only paid for 40 hours, although there were a few times that I

13  did get paid for 45.

14  Q.  What's the most amount of hours you were ever paid for?

15  A.  I believe the most amount of hours I was ever paid for was

16  45 while working 55 many times.

17          THE COURT:  How many times were you paid for 45 hours

18  a week?

19          THE WITNESS:  I would say mostly -- because, as I

20  stated before, I worked just about six days a week.  So six

21  days a week times ten hours, 60 hours, give or take.  Sometimes

22  the store, for example, on Sundays, we would close earlier.  So

23  it doesn't -- it wouldn't account for the ten hours.  About 55

24  would be the normal week worked, but sometimes there was times

25  there was other employees that worked or I would get a day off

HBDsMED1                        Medina – cross

1   more than usual.  So sometimes I would work five days,

2   sometimes I worked six.  If I worked five, then it would be

3   about 45.  But if I worked the six, it would be about 55 total.

4              MS. ISAACSON:  No further questions.

5              THE COURT:  Cross-examination?

6   CROSS-EXAMINATION

7   BY MR. CHUN:

8   Q.  Mr. Medina, good morning.

9   A.  Morning.

10  Q.  How did you come to work for East Communication, Inc.?

11  A.  Do you mean how I arrived, like, how I actually got to the

12  location?

13  Q.  OK.  You said you started working there in February of

14  2015.

15  A.  Um-hmm.

16  Q.  Did you answer an ad or were you referred by a friend to

17  this position?  How did you come to know about this position?

18  A.  Well, actually, I believe a friend of mine -- well,

19  actually, she was an ex-employer, I would say, to be accurate.

20  So she was my previous boss and she referred me to Mr. Park.

21  She said, hey, there is another job opening that might provide

22  more hours.  At the time, that other job, which was in the

23  area, didn't provide stable hours and I was looking for

24  something a little bit more stable.

25  Q.  OK.  When you say you were working, where were you working

HBDsMED1                      Medina - cross

1   here before you started working?

2   A.  C&C Market Research, which is also located in the Bronx.

3   Actually, pretty close to the Metro location.

4   Q.  Well, how close?

5   A.  I would say, like, two blocks.  Actually, funny enough,

6   they started off in that location, then had moved next door,

7   and then eventually they moved about -- you would kind of say

8   across the street next to an Applebee's, which is where they

9   are currently located now.

10  Q.  When you say they, C&C Market Research?

11  A.  C&C Market Research, yes.

12  Q.  So when you were working for C&C Market Research, that was

13  within the same --

14  A.  Same mall area or same radius, you could say.

15  Q.  OK.  That C&C Market Research, were you responsible for

16  opening and closing?

17  A.  Sometimes, yes.  But most of the time, I worked as what

18  they would call field supervisor.  So just to provide some

19  background on what C&C Market Research is and what I did

20  there --

21  Q.  That is not necessary at this point.

22  A.  OK.  No problem.

23  Q.  So then your ex-employer recommended you to work here at

24  East Communications, Inc., because you were seeking how many

25  hours to work at the time you were thinking about leaving C&C

HBDsMED1                          Medina - cross

1   Market?

2   A.  Well, when this occurred, I was only part-time at C&C, and

3   I was looking to increase the amount of hours worked to

4   full-time.

5   Q.  So part time, you mean how many hours?

6   A.  Between 25 to 30.

7   Q.  And how were you paid?

8   A.  I was paid on the books by check or direct deposit.

9   Q.  OK.  Then you had a meeting with Mr. Park regarding working

10  at East Communications, Inc., is that correct?

11  A.  I believe so, yes.  I recall an interview, not necessarily

12  a meeting.

13  Q.  OK.  An interview.  Were you hired on the day of the

14  interview?

15  A.  No, I don't believe so.  I believe we spoke and he said he

16  would think about it, and then I approached him again, and I

17  think he said, yes, we'll move forward.

18  Q.  When you say you spoke, for this initial interview, this

19  was a face-to-face interview?

20  A.  Yes.  We spoke -- at the store.

21  Q.  Thank you.  Did it take place in the store?

22  A.  Yes.

23  Q.  OK.  During this first interview, your first meeting with

24  Mr. Park --

25  A.  Um-hmm.

HBDsMED1                    Medina - cross

1    Q.   -- was the topic of hours to be worked discussed?

2    A.   He didn't mention a specific number, but he did say that he

3    was looking for someone full-time.

4    Q.   OK.   During the initial interview, was there a discussion

5    about hourly pay?

6    A.   He mentioned that he would prefer to pay in cash, and that

7    because of that, he would only be able to pay $9 an hour

8    because I was also not being taxed.

9    Q.   OK.   You accepted this?

10   A.   Well, like I said, I was looking to make a living and I

11   needed more hours, so yes.   I accepted it at that time.

12   Q.   OK.   Before you started working, did you know what your job

13   was going to entail?

14   A.   Actually, I had never worked in a phone store previously.

15   It was my second job, so no.   They kind of had to show me the

16   ropes and train me what to do and what not to do.

17   Q.   OK.   One of the first things they taught you was opening

18   the store with the gate, is that correct?

19   A.   I believe so, yes.

20   Q.   You knew at the time that around February, that it was a

21   manual gate, is that correct?

22   A.   Yes.

23   Q.   In February, did you express any concern about the metal

24   gate to anybody working on behalf of East Communications, Inc.?

25   A.   Not to my knowledge, but I don't think that is why we're

HBDsMED1                              Medina - cross

1    here today.

2    Q.   Thank you.

3              Now, when did you first become aware of the clock in

4    and clock out of the store?

5    A.   Like I said, towards the end of my employment, because when

6    I got there and they showed me procedures such as clocking in

7    and clocking out, logging in and out, shutting down the

8    computers, all that, end-of-day procedures, etc., it was

9    working at that time.

10   Q.   OK.  Was it working in February when you started?

11   A.   To my knowledge, yes.

12   Q.   What is the systems, is that like some kind of a card you

13   have to insert?

14   A.   No.  It was basically a desktop computer with a screen

15   connected to it, and the program on the screen where you would

16   select your name, log in, and then I just click clock in or

17   clock out, no by mention or special other equipment.

18   Q.   Is there a password?

19   A.   I believe so.  I don't remember specifically.  It was a

20   while back.  There might have been one.

21   Q.   Did you create the password?

22   A.   Actually, I believe it was given to me.  I don't believe I

23   created the account.  The information was provided to me, if

24   there was one.

25   Q.   So you started working.  When you were first working, it

HBDsMED1                    Medina - cross

1   was just you and Mr. Park or Mr. Yo?

2   A.  It was me, Mr. Park, Mr. Yo, and also Ms. Colonie-Flores.

3   She provided some, if not a lot, of the training.

4   Q.  OK.  About how much training did you receive?

5   A.  I would say about a week's worth.  About a week's worth.

6   They showed me calculations and how to --

7   Q.  Thank you.  After the week's worth, then were you working

8   by yourself at the store?

9   A.  I don't think it happened that quickly.  I think that they

10  were kind of in the store with me.  Once they saw that I was

11  able to do transactions, then yes, I started working by myself.

12  Q.  OK.  Now, do you recall the date that you started working

13  here at East Communications, Inc.?

14  A.  The exact date, no, but I believe it was around

15  February 21st, 2015.

16  Q.  February 21st.  Now, when you say you were paid weekly, was

17  that your understanding when you were hired?

18  A.  Yes.  The understanding was that I would be paid weekly.

19  Q.  What day of the week was that to be paid?

20  A.  Normally, I believe, Saturdays, but it did change.

21  Q.  All right.  So were you paid the first week that you were

22  there?

23  A.  I believe so.  I don't think he took any kind of deposit

24  or, like, you know, sometimes they keep pay.  I don't think so.

25  I think he paid me.

HBDsMED1                    Medina - cross

1    Q.  All right.  So the first Saturday after you worked, were

2    you paid?

3    A.  I believe so, yes.

4    Q.  Do you recall?

5    A.  Well, it was about two years ago at this point, so I don't

6    recall specifically, but I did get paid at the beginning, as I

7    mentioned before, so I am assuming that he did.

8    Q.  OK.  We are just going to go through week by week.

9    A.  OK.

10   Q.  The first week that you worked, you got paid.  You got paid

11   in full?

12   A.  In full, yes.  At that time, I wasn't working overtime.

13   Q.  Do you recall how many hours you worked the first week?

14   A.  Under 40 hours at that time.

15   Q.  Do you recall exactly how many hours?

16   A.  Not exactly, but I would say about 30 to 35.

17   Q.  And you say that based on what?

18   A.  Based on the fact that I was in training at that time.

19   Q.  OK.

20   A.  And there was other people in the store with me.

21   Q.  How many hours were you working per day that you were there

22   the first week?

23   A.  The first week, not a full day.  I would only go in for

24   maybe five, six hours, get trained, and then either Colonie,

25   Mr. Yo, or Luis would end out the day.

HBDsMED1                          Medina - cross

1    Q.  Was it like that for the first week?

2    A.  You could say that.

3    Q.  How many days did you work the first week?

4    A.  Again, I don't remember exactly.  I would say probably four

5    to eight out of seven.

6    Q.  OK.  Four days out of seven and was that about five to six

7    hours each of those days?

8    A.  Yeah, that sounds about right.

9    Q.  And you kept no record of your first week?

10   A.  Not at that time.  I didn't feel the need because they had

11   shown me the clock-in and clock-out system and they were there

12   present as well.

13   Q.  OK.  Now, the second week that you worked, which takes us

14   to -- we'll just go with March.

15   A.  OK.

16   Q.  Month of March, 2015.  Do you recall how many hours you

17   worked that month?

18   A.  I would say at least 40.

19   Q.  At least 40?

20   A.  A week.

21   Q.  OK.  What was the policy regarding overtime?

22   A.  To my knowledge, there was never any policy provided.

23   Q.  OK.  Did you ask anybody from East Communication, Inc., if

24   you could work overtime?

25   A.  I didn't ask.  I was just instructed to do.

HBDsMED1                          Medina - cross

1    Q.  Thank you.

2           MR. CHUN:  Move to strike everything after I don't

3    think so.

4           THE COURT:  No, he was answering your question.

5    Q.  OK.  Were you paid for the month of March?

6    A.  I was paid for normal hours worked, not including overtime.

7    Q.  How many hours did you work overtime?

8    A.  I couldn't tell you exactly.  That was a while ago, but as

9    I mentioned before, if I worked 45, I would only get paid 40.

10   Q.  What proof do you have of working 45 hours for the month of

11   March 2015?

12   A.  I have no proof.

13   Q.  Thank you.

14   A.  But I don't believe you guys have anything against that

15   either.

16   Q.  OK.  So the first week of March, do you believe that you

17   worked more than 40 hours?

18   A.  Not the first week because, again, I was still under

19   surveillance or being monitored.  I wasn't there by myself the

20   whole time.

21   Q.  Were you paid for that first week of March?

22   A.  Yes.

23   Q.  OK.  Who gave you the cash?

24   A.  Mr. James Park.

25   Q.  OK.  You were OK with the amount that you received?

HBDsMED1                          Medina - cross

1   A.  At that time, yes.  It was accurate to the hours I worked.

2   Q.  OK.  Now, the second week of March, do you recall how many

3   hours you worked that week?

4   A.  I think it still remained around the 40-hour mark.

5   Q.  There was ten hours a day for four days a week?

6   A.  Yes.  I was working four days and someone else would work

7   in the store for two days.

8   Q.  That second week in March, 40 hours, four days a week, you

9   were the only one in the store?

10  A.  I believe once I was given the key, I'm not sure if it was

11  the second week of March, but once I was given the key, I was

12  pretty much in the store by myself as I worked.

13  Q.  OK.  Do you recall, when you received the key, that you

14  would then be able to start working by yourself?

15  A.  Let's see.  It wasn't during the first week of training and

16  I don't believe it was the week after.  Maybe either end of

17  March or beginning of April.

18  Q.  For the second week of March, did you work more than

19  40 hours?

20  A.  I don't believe so.

21  Q.  OK.  Were you paid for the second week of March?

22  A.  Yes, I was.

23  Q.  Were you paid in full?

24  A.  Yes.

25  Q.  Did you receive anything other than cash for these now

HBDsMED1                    Medina – cross

1    three weeks that you have been working?

2    A.  No.

3    Q.  Did you request any receipt or written documentation

4    regarding the hours that you worked?

5    A.  I did, actually.

6    Q.  OK.  Did you request that in writing?

7    A.  Well, I requested it and I was told that it wasn't possible

8    because they had already started to pay me in cash.

9    Q.  OK.  You were OK with this?

10   A.  Well, given the alternative, possibly being fired if I

11   chose to argue, yes.

12   Q.  OK.  Now we'll move to the third week in March.  Do you

13   recall how many hours you worked?

14   A.  Again, I believe at that time it still remained within the

15   40 hours.

16   Q.  That was four days a week, ten hour shifts, is that

17   correct?

18   A.  Yes.

19   Q.  Now, was your understanding that you were going to work ten

20   hours each shift?

21   A.  Yeah.  It was explained to me that once I was trained, I

22   was going to be what is called in the business a one-man store

23   for the most part.

24   Q.  Was it your understanding that it was going to work ten

25   hours or nine hours plus a lunch break of one hour?

HBDsMED1                        Medina - cross

1    A.  My understanding was that I was to work from opening to

2    close with a 30-minute break that I was unable to take most of

3    the time.

4    Q.  OK.  For that 30-minute break, were you paid?

5    A.  Well --

6    Q.  Strike that.

7         For the 30-minute break, did that count towards the

8    ten hours?

9    A.  I believe so, yes.

10   Q.  For the third week in March, which is now the fourth week

11   overall that you worked, were you paid in full for that week?

12   A.  Yes.

13   Q.  OK.  Now, for the first four weeks of your employment, did

14   you make any deposits of your money that you received into the

15   bank?

16   A.  My money?  Possibly.  At that time I had, I believe, a

17   Chase account.  So yeah, I wouldn't see why I wouldn't.

18   Q.  Did you produce those deposits to your attorney?

19   A.  No.  Unfortunately, they don't go -- those records don't go

20   back that far and I didn't have any pre amount.

21   Q.  All right.  For the fourth week in March, do you recall how

22   many hours you worked?

23   A.  Again, probably still 40 hours.  It took a while for me to

24   start working more than that.

25   Q.  Were you paid in full for the month of March -- I'm sorry.

HBDsMED1                     Medina - cross

1          For that fourth week in March, were you paid in full?

2     A.  Yes.

3     Q.  OK.  Now into April.

4          Wait a minute.  You noted here, when you were shown

5     Plaintiff's Exhibit 5, you noted that March 26, 2015, that

6     entry appeared to be wrong, inaccurate?

7     A.  Yeah.

8     Q.  How is it in accurate?

9     A.  It's pretty -- obviously, I didn't have it in front of me

10    at the time --

11         THE COURT:  Can we give the witness the exhibit so he

12    doesn't have to recall.

13    A.  OK.  Thank you.

14         You said March 26, correct?

15    Q.  Yes.

16    A.  I'll read it verbatim, as I am sure you guys are looking at

17    it as well.  It says I clocked in at 10:35 and 31 seconds,

18    which would actually mean I was late, and then it states that

19    I clocked out that same day at 11:59 p.m., which if I am not

20    mistaken that is almost midnight, and obviously I was at home

21    at that time.

22    Q.  OK.  Were you still using the password to log in and log

23    out of your times in the month of March?

24    A.  Well, I can't say for certain because, again, as I stated

25    many times before, this was a while back ago, and I don't think

HBDsMED1                    Medina - cross

1   anyone can say for certain in a two-year span what they did a

2   certain date, but from what I recall, once you inputted the

3   information, if there was no one else logging in and out, the

4   system did not request for you to input the password.  But that

5   could be incorrect.

6   Q.  Did you bring that up with Mr. Park or Mr. Yo?

7   A.  I did mention to them a few times that the system was not

8   working properly or that I wasn't able to log in or out

9   correctly.

10  Q.  What was done about that?

11  A.  They said that they would repair the system, but they never

12  did.

13  Q.  Do you have any proof of that?

14  A.  No, I do not.

15  Q.  OK.  Now we're into April, the first week of April.

16  A.  OK.

17  Q.  Do you recall how many hours you worked that week for East

18  Communication, Inc.?

19  A.  As I stated before, I believe at that time I was given the

20  keys and the code to the lock and the code to the alarm.  So at

21  that time, I believe I started working over 40 hours.

22  Q.  OK.  Do you have any proof of that?

23  A.  No, other than my word.

24  Q.  So were you paid for that week, the first week in April,

25  for the hours that you worked?

HBDsMED1                        Medina - cross

1    A.  For the total hours?  I don't believe so.

2    Q.  You don't believe so.  How much were you paid the first

3    week?

4    A.  I believe I was only paid for 40 hours.

5    Q.  You don't have a deposit slip or any proof of what you

6    received for the first week of April, is that correct?

7    A.  No, I do not.

8    Q.  You didn't start logging your hours by hand the first week

9    of April, is that correct?

10   A.  No, I did not because I had confidence that my employer was

11   going to fix the system.

12   Q.  OK.  What do you mean "to fix the system," fix this

13   entering --

14   A.  The clock-in system.

15   Q.  OK.

16   A.  Because at the time I was only paid the 40 hours because

17   the system was inaccurate, so we had to agree that we would

18   kind of call it even.

19   Q.  What do you mean that you would agree that you would call

20   it even?

21   A.  Me and Mr. Park would always speak, since he was the one

22   who paid me.  And I said, hey, I worked about 45 hours, you

23   know, there is some overtime that you owe me.  And he said, oh,

24   well, the system had some inaccurate clock-in times.  I

25   actually believe I owe less.  So I said, OK, why don't we call

1    it even and just pay me for a full normal week.

2    Q.  That is what you received?

3    A.  That is what I received.

4    Q.  You're saying this now under oath, that you agreed to the

5    amount to be paid to the equivalent of 40 hours a week?

6    A.  For that week only.

7    Q.  For that week only?

8    A.  For that particular instance.

9    Q.  For that week only.  Thank you.

10           Now, for the second week of April, do you recall how

11   many hours you worked?

12   A.  Again, at that time, I think I was working more than

13   40 hours.

14   Q.  OK.  Do you have any proof of that?

15   A.  As I stated, no, I do not.

16   Q.  OK.  Were you paid for the second week of April?

17   A.  I was paid 45 hours at $9 an hour.

18   Q.  How many hours did you work?

19   A.  The 45.

20   Q.  Did you get paid for the overtime for what you say is about

21   five hours?

22   A.  No, sir.

23   Q.  No?

24   A.  Only $9 per that extra five hours.

25   Q.  OK.  You weren't paid that the following pay period?

HBDsMED1                    Medina - cross

1   A.  I was paid the following pay period, but not related to

2   anything prior, just what I was owed for the next week.

3   Q.  OK.  So then are you saying that starting from the second

4   week of April, then you didn't get paid for your overtime wage,

5   is that correct?

6   A.  Yes, I think that would be correct.

7   Q.  OK.  Now, for the third week of April, do you recall how

8   many hours you worked?

9   A.  Again, probably 45.

10  Q.  OK.

11  A.  That was the normal workweek, if I wasn't asked to work an

12  extra day.

13  Q.  That's based on what, Mr. Medina?

14  A.  That is based on the fact that I worked four to five days

15  a week, sometimes six, and the typical week was working five

16  having two days off.  While working five, sometimes I would

17  work five days, which were ten hours a day, which would

18  actually equate to 50 hours total.  But then sometimes I would

19  work on a Sunday for one of those fifth days, and Sundays we

20  didn't open as late.  We only opened from 12 to six.  So,

21  therefore, the store was opened for about five hours only, and

22  the other 40 hours that I worked, so therefore it would be

23  about 45.

24  Q.  OK.  How much were you paid for that week?

25  A.  Again, any time that I was paid, I was not paid overtime.

HBDsMED1                      Medina - cross

1    I was only paid $9 an hour.

2    Q.  Were you paid the equivalent of $9 an hour for 45 hours?

3    A.  Yes.

4    Q.  What about now the fourth week of April, how many hours did

5    you work for that week?

6    A.  Same as previously.  40 hours, 45 if I was asked to work an

7    extra day.

8    Q.  Were you asked to work the extra day for the fourth week of

9    April?

10   A.  It's possible because I was at the time the only other

11   employee other than the bosses or owners themselves.

12   Q.  Do you have any proof that you worked six days, where the

13   fifth day for the fourth week of April?

14   A.  I myself don't have any proof, but if I sat here and maybe

15   looked through these time sheets, I could probably confirm

16   that.  Like I said, although the system didn't always work and

17   it did work from time to time.

18   Q.  It did work from time to time.  How did you know that it

19   worked from time to time?

20   A.  I would use it every day.  Sometimes it just wouldn't clock

21   me in or clock me out and sometimes it would.  Therefore, it

22   worked from time to time.

23   Q.  OK.  Did you keep a note or write an e-mail to your

24   employer?

25   A.  Just a phone call and say, hey, I clocked in today at

HBDsMED1                        Medina - cross

1    whatever time and the system wasn't working properly.

2    Q.  OK.  Now, for the fourth week of April then, how much were

3    you paid?

4    A.  The 40 hours.

5    Q.  Did you work 40 hours or 45 hours?

6    A.  Like I said, I don't recall for certain, but it is possible

7    I worked the between 40 to 45 hours.  If I had to pick, I would

8    say 45.

9    Q.  OK.  So then that means that if you're picking, then for

10   the month of April, that's 15 hours worth of the -- I guess the

11   half, it would be $4.50 for 15 hours?

12   A.  Yeah, sounds correct.

13   Q.  That's $67.50.  Did you ask for that money in the end of

14   April?

15   A.  I don't believe I did.

16   Q.  OK.  Would you say that for the month of April then that

17   your relationship with East Communication was OK with respect

18   to payment?

19   A.  I felt good to work there.  I didn't have any issues with

20   the employment, but I was concerned that I wasn't being fully

21   paid at the time.

22   Q.  What do you mean by when you say you didn't have any

23   concerns with employment?  What does that mean?

24   A.  Well, meaning, like I said, I was pretty new to the job

25   and, you know, things were going well.  I was selling.  You

HBDsMED1                         Medina - cross

 1   know, I had responsibilities.  So given that this was my second

 2   job, I felt good that I was able to, in a sense, manage a store

 3   even though I didn't have that title.

 4   Q.  OK.  We'll take it a little further back.  When you say you

 5   had no concerns, had no concerns with opening the gate?

 6   A.  No, opening the gate never bothered me.  That is not why

 7   we're here today.

 8   Q.  OK.  You had no concerns with unlocking the door and

 9   deactivating the alarm?

10   A.  No.  Again, that is not why we're here.

11   Q.  You had no concerns with turning on the computers and

12   logging in?

13   A.  Well, I had a concern that the clock-in system was not

14   working properly, but it wasn't a difficult task to accomplish.

15   Q.  All right.  Did you have any concerns about working there

16   by yourself?

17   A.  Not at first, but as I started to relate more with the

18   clients and some of them became hostile, and I did become

19   concerned.

20   Q.  Now, before you cash out and do your end-of-day business,

21   was the policy to lock this door first to prevent other people

22   from coming in?

23   A.  Yes, that's correct.

24   Q.  OK.

25   A.  And that was done.

HBDsMED1                    Medina - cross

1    Q.  Now we'll turn your attention to the month of May,

2    Mr. Medina.

3              THE COURT:  I think you skipped a week in April.

4    There is actually five weeks, the week starting Sunday,

5    April 26.

6    BY MR. CHUN:

7    Q.  For the last week of April, do you recall how many hours

8    you worked?

9    A.  Again, if I had to choose, I would say 45.

10   Q.  Were you paid 45 hours?

11   A.  At $9 an hour, I was paid for 45 hours, yes.

12   Q.  OK.  So then is it correct to say that for the month of

13   April then, you were paid 20 hours' worth of the overtime of

14   the half, or in other words, $90 for the month of April, is

15   that correct?

16   A.  I'm sorry.  Can you clarify that?  I didn't understand.

17   Q.  For the month of April, you worked 20 hours of overtime?

18   A.  Yes.

19   Q.  You were only paid at the normal hourly rate, not the

20   overtime rate, is that correct?

21   A.  That is correct.  By normal, if you mean $9 an hour?

22   Q.  $9.  When you were supposed to be paid 13.50, is that

23   correct?

24   A.  Well, I don't know.  You did the calculation, not me, but I

25   assume so.

HBDsMED1                    Medina - cross

1    Q.   OK.   You continued to work at East Communication?

2    A.   Yes.

3    Q.   Now, for the month of May, do you recall how many hours you

4    worked for the first week?

5    A.   Again, if I had to choose, I would say 45 at that time.

6    Q.   OK.   How much were you paid?

7    A.   45 hours times $9 an hour.

8    Q.   For that first week of May, were you the only one in the

9    store when you were working?

10   A.   Yes.   I would definitely say by that time I had "proven

11   myself" and I kind of had the responsibility on my shoulders of

12   making sure the store worked properly.

13   Q.   OK.   What about for the second week of May, do you recall

14   how many hours you worked?

15   A.   Again, probably 45 in the morning to 50, as I was working

16   there more often, starting to stay later, open earlier to try

17   to get more sales.

18   Q.   All right.   How much were you paid for the second week of

19   May?

20   A.   As I'm unsure exactly how many hours I worked, I would have

21   to go with the stable 45 hours at $9 an hour.

22   Q.   But you're unsure of the second, third, fourth, fifth week

23   of April as well, that's the first thing, you're unsure about

24   the hours that you worked, is that correct?

25   A.   No, I don't believe so.   I said if I had to choose, I would

1    say 45.   The only reason why I am unsure of those hours by your

2    statement is because it was a long time ago, not because I

3    believe I worked.   If anything, I might have worked more.

4    Q.   OK.   But you kept no log for your own personal accounting

5    of the hours that you worked for the month of May 2015, is that

6    correct?

7    A.   No.   At that time, I was not keeping a record.

8    Q.   OK.   You stated that you were paid 45 hours at $9 an hour

9    for the second week of May, is that correct?

10   A.   Yes, it is.

11   Q.   What about for the third week of May, how many hours did

12   you work there, Mr. Medina?

13   A.   Well, being that the weather was getting warmer and we were

14   getting into the summer seasons and there was some sales at

15   that time, there usually are, for phone companies at that time,

16   I believe I started working more, about 50 hours.

17   Q.   How many hours were you paid for that third week of May?

18   A.   I would say 50 hours at $9 an hour.

19   Q.   What about for the fourth week of May, Mr. Medina, how many

20   hours did you work?

21   A.   I would say, again, probably 50 at that time.

22   Q.   And you were paid for 50 hours?

23   A.   Yes, at $9 an hour.

24   Q.   So is it correct to say that for four weeks in April and

25   four weeks in May, you did not receive the overtime wage that

1   you were supposed to receive?

2   A.  That is correct.  I also did not receive any documents or

3   pay stubs.

4   Q.  OK.  You continued to work there at East Communications,

5   Inc., is that correct?

6   A.  Yes.  I mean, I was making a living and it was a job that I

7   was capable of doing at the time, so...

8   Q.  And no disagreements or no issues with the employer through

9   the end of May?

10  A.  At that time, no.  He was paying me properly, except for

11  the fact of not paying me the overtime.

12  Q.  So then what did you do about the overtime?

13  A.  Well, if you want me to be honest, I am under oath, so at

14  that time, I wasn't aware that he should have been paying me

15  overtime, because my previous job, I didn't work full-time.  I

16  never reached 40 hours, much less overtime.  I didn't know that

17  I was supposed to be being paid more at that time.

18  Q.  Now, what about for the first week of June, do you recall

19  how many hours you worked?

20  A.  Again, I would have to lean towards 50, possibly more.  The

21  warmer it got, the more we were able to stay open.  Let's not

22  forget also, as well, during the summertime, the sun is out

23  longer.  So, you know, around eight 39 o'clock, it wouldn't be

24  as dark, so we would stay open if the business was booming at

25  the time.

HBDsMED1                        Medina - cross

1   Q.   OK.   Did you receive instructions from James Park to stay

2   open?

3   A.   Directly, no.   Like, I don't believe he said, oh, make sure

4   you stay until nine.   But he did state, if there is customers

5   in the store, make sure you finish any transactions, obviously,

6   before asking customers to leave.   It is not normal practice to

7   say, hey, it's 8:00, you know, get out of the store.   We would

8   normally finish with customers inside of the store, process

9   transactions, and then proceed to close the store and lock the

10  door and do the end of daily proceedings.

11  Q.   For each transaction, did you have to log in your pass

12  code?

13  A.   No.

14  Q.   Did you have to log in anything when you had to make a

15  sale?

16  A.   I believe there was something called RQ, and that did keep

17  track of inventory, but I don't believe there was a way to keep

18  track of sales, per se, as far as the system.

19  Q.   Do you recall how many hours you worked for the second week

20  of June?

21  A.   Again, as the weather was getting warmer at that time, I

22  believe I started to work more hours.   I would say 50 hours for

23  that week.

24  Q.   50 hours.   For the first two weeks in June, you were paid

25  50 hours at $9 an hour, is that correct?

1   A.  Yes.

2   Q.  You're positive that you received the amount of $450 for

3   the first two weeks of June each week?

4   A.  Yes, sir.

5   Q.  OK.  What about for the third week of June, how many hours

6   did you work, Mr. Medina?

7   A.  Probably the same.

8   Q.  Probably the same.

9   A.  So if you want me to state it, 50 hours times $9 an hour.

10  Q.  And how much were you paid?

11  A.  Well, according to your calculation, I believe you said

12  4.50.

13  Q.  So is that correct?

14  A.  Yes, I would say so.

15  Q.  What about for the fourth week of June, how many hours did

16  you work at the store?

17  A.  Once again, I believe it would probably be 50 and at $9 an

18  hour per hour.

19  Q.  4.50.  Now, for the month of June 2015, you have no deposit

20  slips or no bank records --

21  A.  No.

22  Q.  -- of the monies that you made?

23  A.  No.

24  Q.  Did you put the monies that you earned for the month of

25  June, did you put that into a bank account?

HBDsMED1                          Medina - cross

1   A.  To be honest, like I said, although I did have a bank

2   account, it's possible I might have put some of it.  The rest I

3   might have maybe used towards a credit card or just paid a bill

4   in cash, not necessarily put it into the bank account.

5   Q.  Do you have any receipts or anything to show payments that

6   you made for the month of June, 2015?

7   A.  No.  I wasn't asked to provide that information.

8   Q.  Now, I'll turn your attention to the week of -- the first

9   week of July.  Do you recall how many hours you worked?

10  A.  Given that -- I'm not sure, but I believe the fourth of

11  July is in the first week of July.  So at that time, we had

12  sales going on and I had been working for a few months.  So I

13  believe at that time, I started working 55, possibly even 60

14  hours a week.  Not necessarily by myself, because when it got

15  to these busier times when we had deals, sometimes Mr. James

16  Park would be in the store or Mr. Luis Yo or maybe even both,

17  if the store was busy enough.

18  Q.  OK.  Do you recall in the month of July when both Mr. Park

19  and Mr. Yo were in the store with you?

20  A.  Not a specific day, but I do believe that they might have

21  been around fewer hours here and there to assist with sales and

22  other proceedings.

23  Q.  How much were you paid for the first week of July?

24  A.  That is when I believe they only started paying me maybe 45

25  at the most 50 hours at $9 an hour, but I was working more than

HBDsMED1                    Medina - cross

1    that.

2    Q.  OK.  What about for the second week of July, how many hours

3    did you work?

4    A.  Although the sales had probably ended by that time, it was

5    still a busy time.  People were buying phones to, you know, go

6    out or possibly travel.  Those phones worked in -- the service

7    worked in Santo Domingo, Dominican Republic, although the

8    people would buy them to use while they were traveling.  I

9    believe I also worked between 55 and 60 hours at $9 an hour.

10   Q.  How many hours were you paid?

11   A.  Again, unfortunately, a lot of those hours were not being

12   acknowledged, so I believe I was only paid 45 hours, maybe 50.

13   Q.  Do you know how much you actually received for the second

14   week of July worked?

15   A.  Not for certain, but if I had to choose a specific number,

16   I would probably say 50 times $9 an hour.

17   Q.  For the third week of July, Mr. Medina, how many hours did

18   you work?

19   A.  Well, I believe at that time, you know, it would have

20   slowed down a little bit.  That holiday rush from the July 4

21   deals would have calmed down.  At that time, I think I went

22   back to 45 hours for the week at $9 an hour.

23   Q.  How much were you paid?

24   A.  I was paid for 45 at $9 an hour.

25   Q.  What about for the fourth week of July, Mr. Medina, how

HBDsMED1                          Medina - cross

1  many hours did you work?

2  A.  Again, at that time, probably slowed down, so 45 hours

3  times $9 an hour.

4  Q.  When you say probably, so for the last third week, third

5  and fourth week of July, you said probably.  Do you know for

6  sure?

7  A.  I can't say for certain.  I am going off of the fact of how

8  sales would be, and sales usually affected the amount of time

9  the store would be open as a total over the regularly scheduled

10 time.

11 Q.  How many hours were you paid for this fourth week of July?

12 A.  I believe I was paid 45 hours at $9 an hour.

13 Q.  You still had not recorded your own personal log of hours

14 worked, is that correct?

15 A.  No, not at that time.

16 Q.  Now we're into August.

17         THE COURT:  There is one more week in July.

18         MR. CHUN:  Thank you.

19 Q.  So for the fifth week of July, do you recall how many hours

20 you worked?

21 A.  Again, I would probably say stick to 45 hours.  At that

22 time, I mean, I was pretty much running the store on my own.

23 Q.  How many hours were you paid?

24 A.  I was paid for 45 hours at $9 an hour.

25 Q.  For the month of July, who paid you the money?

HBDsMED1                        Medina - cross

1    A.  Mr. James Park.

2    Q.  OK.  He paid you on Saturday?

3    A.  Yes.

4    Q.  OK.  So you sat down with him for the month of July each

5    Saturday.  Was Saturdays the day that you worked?

6    A.  Yes.  I didn't normally work Saturdays, and sometimes I was

7    off on Sundays, so that is why he chose to pay me on Saturday

8    versus Sunday.

9    Q.  I see.  So that would be your last day of the week.  So

10   your work day was typically Monday through Saturday, is that

11   correct?

12   A.  Yes, with, let's say, maybe a Thursday and a Sunday off.

13   Q.  OK.  Understood.  You told Mr. Park how many hours you

14   worked each week or the month of July, and each time he paid,

15   he paid you just 45 to 50 hours paid at $9 an hour for the

16   first two weeks, and $45 an hour for the third through fifth

17   weeks in July, is that correct?

18   A.  I'm sorry.  I think you misspoke.  You said $45 an hour.  I

19   never made that.

20   Q.  45 to 50 at $9 an hour for the first week of July, he gave

21   you that money?

22   A.  Yes.

23   Q.  OK.  But you can't recall how much it actually was?

24   A.  Well, you can do a simple calculation, and if you do that,

25   it should be that amount.

HBDsMED1                       Medina - cross

1   Q.  How do we do the calculation?

2   A.  Well, as me and Mr. James would do when we would sit down,

3   you go, OK, you worked 45 hours, 45 hours timed $9 an hour

4   equals, you know, whatever that is.  I believe 450, maybe 400.

5   Q.  By the end of July, did you ask Mr. Park regarding the

6   overtime amount that you were supposed to be paid for April,

7   May, June, and July?

8   A.  Actually, at that time, I was still not aware that I was

9   supposed to be receiving overtime pay as well as any kind of

10  other documentation.

11  Q.  OK.  Now, turn your attention to August then, the first

12  week of August.  Do you recall how many hours you worked?

13  A.  I would say 45 hours times $9 an hour.

14  Q.  That is how much you were paid?

15  A.  I believe so.

16  Q.  Well, do you know?

17  A.  I don't know for certain, as I don't have a pay stub to

18  prove that, but I would say, based on my recollection, yes.

19  Q.  For this first week of August now?

20  A.  Um-hmm.

21  Q.  Did you deposit the money that you earned into an account?

22  A.  As I have stated before, as the money was given in cash,

23  sometimes I would just use it maybe for a cab or personal

24  bills, so I didn't necessarily deposit all of it at the moment

25  that I received pay.

1  Q.  OK.  So then let's turn your attention now just to the

2  first week of August.

3  A.  OK.

4  Q.  First week of August, did you deposit any of your money

5  that you made into an account?

6  A.  Yeah, probably some of it.

7  Q.  Probably.  OK.  Do you recall which account?

8  A.  Into a Chase Bank account.

9  Q.  Do you have the receipts or the account information for

10  this period?

11  A.  No, I do not, unfortunately.

12  Q.  No.  OK.  Now, for the second week of August, how many

13  hours did you work that week?

14  A.  I would still say about 45 hours a week times $9 an hour.

15  Q.  That is how much you were paid?

16  A.  Yes.

17  Q.  You know that for a fact?

18  A.  As I stated before, as I know him having proof, I can't

19  state for a fact as I am under oath, but I would say, based on

20  my recollection, yes.

21  Q.  OK.  Now, for the third week of August, how many hours did

22  you work?

23  A.  Again, I would state 45 times $9 an hour.

24  Q.  Is that how much you were paid?

25  A.  I believe so, yes.

HBDsMED1                       Medina - cross

1    Q.  Well, you believe so meaning is your recollection for the

2    third week better than the second week?

3    A.  Actually, no, but since you insist on asking the same

4    questions, I am going to provide you with the same answer,

5    which is I don't remember.  So, therefore, I can only go to the

6    best of my recollection.

7    Q.  OK.  So the best of your recollection is for the second and

8    the third week of August, you worked 45 hours and you were paid

9    $45 an hour times $9?

10   A.  Actually, you misspoke again.  You said $45 an hour.  I was

11   never paid $45 an hour.  I was paid $9 an hour for 45 hours.

12   Q.  That is your recollection for the second and third week of

13   August?

14   A.  Yes.

15   Q.  For the fourth week of August, do you recall how many hours

16   you worked?

17   A.  Again, I would say 45 hours times $9 an hour.

18   Q.  How much were you paid?

19   A.  I was paid for those 45 hours worked at $9 an hour.

20   Q.  What about now into September, the first week of September,

21   Mr. Medina, do you recall how many hours you worked?

22   A.  I don't recall, but based on my record, I can probably give

23   you that information.

24   Q.  OK.  You have a record?

25   A.  Yes.  In September was when I started to document -- we are

HBDsMED1                     Medina - cross

1   in September, correct?

2   Q.  Yes, first week of September.

3   A.  So for the first week of September, based on document

4   Exhibit 6, does everyone have that in front of them?  Ten hours

5   on the first day, ten hours on the second, ten hours again on

6   the third, I was off on the fourth.  On the fifth, I worked ten

7   hours.  On the sixth, I was off.  On the seventh, I was off.

8   On the eighth, I believe I was off -- no, the eighth is ten

9   hours.  Sorry.  And the 9th is also ten hours.

10          I don't know.  Did I go over a week?  I believe so.

11  We said only a week, yes?

12  Q.  Yes.  I asked for the first week of September.

13  A.  Can you state what the dates would be so that I can give

14  you accurate information?  So from the first to the seventh,

15  would that be correct?

16  Q.  I am going to get you that information.  First week of

17  September, your pay period is from Monday through Saturday, so

18  it would be from August 31st to September 5.

19  A.  OK.  So I don't have August 31st, since I decided to start

20  it on the first of the month of September, but I do have the

21  first, and that day I worked ten hours.  You said to the fifth?

22  Q.  Yes.  That's a Saturday.

23  A.  So ten, ten, that's 20, 30.  I was off on the fourth.

24  40 hours.

25  Q.  OK.

HBDsMED1                    Medina - cross

1    A.  Based on my own record.

2    Q.  OK.  How many hours were you paid?

3    A.  At that time, I believe I was paid the 40 hours.  I don't

4    see any note saying otherwise, so I would say I was paid 40

5    hours at $9 an hour.

6    Q.  OK.  Now, you started to keep a record?

7    A.  Yes.  As you can tell, this way is much easier to state

8    whether or not you worked or were paid for a particular time

9    period.

10   Q.  Perhaps.  So there is nothing here in the time system for

11   August 31st.  Look at page three of Exhibit 5.

12   A.  OK.  All right.

13   Q.  So the system was still not functioning from time to time,

14   is that correct?

15   A.  Based on the information I have in front of me, it looks

16   like it was not working accurately.

17   Q.  No, based on your recollection.

18   A.  Based on my recollection, do we want to go on fact, or do

19   we want to go on my recollection?

20   Q.  We want to go on your recollection.

21   A.  Yeah.  When we have a document in front of me, shouldn't we

22   go on fact?

23   Q.  What was the event that caused you to start logging in your

24   hours in your own book starting September 1st?

25   A.  The fact that the system was still not working correctly.

1   Does that answer your question?

2   Q.  Yes.  The system had not been working -- well, by not

3   working correctly, do you mean that it was not working from

4   time to time, as you stated earlier, or something else?

5   A.  That it was not working correctly from time to time.  So I

6   was fed up with being told that I had worked less hours than

7   what I had in reality worked.

8   Q.  OK.  At this point in September, you decided not to leave

9   your position at East Communication, Inc., is that correct?

10  A.  That is correct.

11  Q.  OK.  You were not terminated, is that correct?

12  A.  I don't believe so.

13  Q.  So you had this log now.  For now, the second week of

14  September, do you recall how many hours you worked?

15  A.  I don't recall, but I don't feel the need to since I wrote

16  it down.  That was the purpose of it.

17  Q.  OK.  Did you write this down every week or every day?  How

18  did you make your logs?

19  A.  It was a weekly log.

20  Q.  OK.  You would make that on Saturday when you got paid?

21  A.  Normally, yes.  I would sit down and look back on the days

22  that I had worked and jot it down before I spoke with

23  Mr. James.

24  Q.  OK.  At this point, were you aware of overtime pay?

25  A.  I believe, at that time, I may have become aware.  That

HBDsMED1                    Medina - cross

1   might have been one of the reasons I also started to document

2   the time.

3   Q.  But do you recall that?

4   A.  Yes.

5   Q.  Now, up until September, did you continue to log in and log

6   out on the system every day that you came?

7   A.  As I stated before, to my recollection, you didn't have to

8   physically input the log-in information unless someone logged

9   you out and logged in as themselves.  And being that, for the

10  most part, I was the only employee, it was just kind of there

11  for me to just click log in, click on out, meaning clock in,

12  clock out.

13  Q.  Did you clock in and clock out?

14  A.  I attempted to use the system and many times it failed.

15  Q.  It failed.  How does it fail?

16  A.  Well, for example, it would allow me to clock in, but it

17  would not allow me to clock out or vice versa.

18  Q.  Did you keep notes of when you clocked in and when you

19  clocked out for these hours?

20  A.  I didn't keep specific hours, I just kept total number of

21  hours, as shown in Exhibit 6.

22  Q.  OK.  So then let's go then to the second week of September.

23  A.  OK.  That would be from the fifth to -- no, from the sixth,

24  right, to when?

25  Q.  The sixth to the twelfth.  We will do it from Sunday to

HBDsMED1                          Medina - cross

1  Saturday?

2  A.  So on the sixth, as I mentioned, that was a Sunday,

3  correct?

4  Q.  Yes.

5  A.  As I had mentioned before, you will notice that I was off

6  on Sunday, and apparently, according to my record, I was also

7  off for some reason on Monday.  But I went back to work on the

8  eighth, and that day I worked ten hours.  Then I also worked

9  ten hours on the 9th, and also worked ten hours on the tenth.

10 And you said going to the twelfth, is that correct?

11 Q.  Yes, six to 12.

12 A.  That's seven days?

13 Q.  Yes.

14 A.  So ten, ten, ten, ten.  I was off on the 11th and the

15 twelfth, I would have worked ten.

16 Q.  So how many hours is that, Mr. Medina?

17 A.  I would say 10, 20, 30, 40, from what I see here, unless I

18 am calculating incorrectly.  One, two, three -- 40 hours.

19 Q.  Is that correct?

20 A.  Let me double-check.  We said starting from the sixth,

21 which I was off that day, yes?  Start from the sixth to the

22 12th?

23 Q.  Yes.

24 A.  Now, does that complete a whole week?  Because unless I am

25 mistaken, six to 12 would only be six days, not seven.

HBDsMED1                    Medina - cross

1    Q.  I made that mistake too.  It is actually seven.  You have

2    to count the first day as six.

3    A.  Thank you.

4    Q.  Six, seven, eight, nine, 10, 11, 12.

5    A.  OK.  So in that case, I was off for one, two, three days

6    and worked four days for 40 hours.

7    Q.  OK.  How much were you paid?

8    A.  A total of 40 hours a week.

9    Q.  40 hours.  How much were you paid?

10   A.  40 hours times $9 an hour.

11   Q.  OK.  You recall working less for the first week, for the

12   first two weeks of September, than you did for August, is that

13   correct?

14   A.  Yes.

15   Q.  OK.  The weather in September, at least the first two

16   weeks, is about the same as it is in August, is that correct?

17   A.  Not necessarily.  New York it pretty unpredictable, but

18   yeah, give or take.

19   Q.  OK.  Now for the third week of September.

20   A.  We are going from the 13th to what date?

21   Q.  That would be to the 19th.

22   A.  So I have here written down that I worked five hours on the

23   13th, ten hours on the 14th, so that is 15 so far.  On the 15th

24   I worked ten hours.  That's 25.  16, I worked ten hours.

25   That's 35.  And what day are we going until?

HBDsMED1                         Medina - cross

1    Q.   The 16th.

2    A.   16th.

3              THE COURT:  The 19th.

4    Q.   The 13th to 19th.

5    A.   One more time.  Could I actually get something to jot down,

6    since these haven't been calculated hours?

7              THE COURT:  I can take judicial notice of it.  We'll

8    do the math for you.

9    A.   Thank you.  I'm sorry, I am not trying to --

10             THE COURT:  The 14th to the 19th is 51 hours,

11   according to your notes.

12   A.   Yes, which would show that that is when I started to work

13   again over the normal 40 hours.

14   Q.   The third week of September is --

15             THE COURT:  Counselor, just to speed this along, I'll

16   also take judicial notice from September 20 to the 26th,

17   according to the notes in Exhibit 6, it is 55 hours from

18   September 20 to the 26th.

19             MR. CHUN:  OK.

20   Q.   That's 51 hours for the third week.  How many hours were

21   you paid?

22   A.   I believe I was --

23             THE COURT:  55 hours for the week of the 20th to the

24   26th.

25             MR. CHUN:  On the third, I'm on September 13

HBDsMED1                        Medina - cross

1    through 19, 51 hours?

2              THE COURT:  Yes, 51.

3    BY MR. CHUN:

4    Q.  How many were you paid?

5    A.  40 at $9 an hour.

6    Q.  Do you have proof of this?

7    A.  No, I do not.

8    Q.  For the fourth week of September, you were working?

9              THE COURT:  That was 55 hours for the week of

10   September 20 to the 26th.

11             MR. CHUN:  Yes.  That's easy to do it that way.

12   Q.  For the 55 hours that you worked from September 20 to 26,

13   how many hours were you paid?

14   A.  45 at $9 an hour.

15   Q.  Do you have any proof of that?

16   A.  No, but I do recall a conversation -- and the reason why I

17   couldn't remember when he paid -- when he paid me only 40 or

18   45 was because when we would sit down, and I wouldn't say

19   argue, but for this sake have the conversation about how much I

20   was owed, he would state that his record was different from

21   mine and, therefore, he would -- if he agreed that maybe I

22   hadn't worked over the 40 normal hours, he would only provide

23   me with an additional five hours based on the fact that his

24   records did not show me working more than 40 hours.

25   Q.  OK.  Did you request at any time up to this period through

HBDsMED1                    Medina - cross

1  September 26 to be paid daily?

2  A.  Daily?  No, I don't think I would ask for that.

3  Q.  Did you ever ask to be paid twice per week?

4  A.  Not to my knowledge.  I don't believe so.

5  Q.  Now for the week of September 27 to October 3.

6          THE COURT:  Again, I'll take judicial notice of the

7  math calculation here.  According to Exhibit 6, it would show

8  70 hours.

9          THE WITNESS:  How many?

10          THE COURT:  70.  Ten hours each day.

11          THE WITNESS:  That was what days?  I'm sorry.

12          THE COURT:  September 27 through October 3.  You can

13  ask questions about that, counselor.  We are not going to ask

14  the witness to do the math.

15  BY MR. CHUN:

16  Q.  So in that entire seven-day period, you worked all ten

17  hours?

18  A.  Yes.

19  Q.  You worked every day that week?

20  A.  Yes, and I can actually give the reason why, if you would

21  like it.

22  Q.  No.  Including the Sunday is the 26th.  You worked ten

23  hours on Sunday, September 27, 2015?

24  A.  That is correct.

25  Q.  Do you recall what the hours of the store was on that day

HBDsMED1                          Medina - cross

1  from September 27, 2015, that Sunday?

2  A.  I don't recall the specific hours, but going off of my

3  recollection, as I stated before, if the store opens at 12,

4  that would mean I would probably have to be at the store to

5  open around 11:30, possibly earlier.  And if it was a busy day,

6  which by my record, being that I worked ten hours instead of

7  less, means that it was.  I probably left around eight or nine

8  instead of six.

9  Q.  So then on that particular Sunday, September 27, you recall

10  working ten hours?

11  A.  Yes.

12  Q.  How many hours were you paid for this period between

13  September 27 to October 3?

14  A.  I believe I was only paid 45 hours at $9 an hour.

15  Q.  You base that believe on what, Mr. Medina?

16  A.  Again, as I stated previously, when me and Mr. James would

17  sit down to talk about overtime, he would state that, according

18  to my records, I only worked a max of 45 hours, therefore, he

19  would only pay me 45 hours times $9 an hour.

20  Q.  You continued to work through the end of September for

21  East Communication?

22  A.  Yes, I did.

23  Q.  Is that correct?

24      OK.  Now from October 4 to October 10.  Do you recall

25  how many hours you worked from October 4 through October 10?

HBDsMED1                         Medina - cross

1    A.  I don't need to recall.  It is written down.

2    Q.  How many hours is that, Mr. Medina?

3              THE WITNESS:  Judge is going to take judicial notice?

4              THE COURT:  Yes, although I didn't do the math yet.

5    Let's see.  Counselor, did you do the math?  65.

6    BY MR. CHUN:

7    Q.  You worked 65 hours.  You worked every day that week?

8    A.  Yes.

9    Q.  How many hours were you paid?

10   A.  45 times $9 an hour.

11   Q.  What about from October 11 to October 17?

12             THE COURT:  Mr. Medina, what does that say for

13   October 11, 2015, how many hours?

14             THE WITNESS:  11?

15             THE COURT:  10, 11, 15.

16             THE WITNESS:  I believe that's a three, your Honor.

17             THE COURT:  Three.  OK.  So it's 53 hours from

18   October 11 through the 17th.

19   BY MR. CHUN:

20   Q.  Is that correct, Mr. Medina?

21   A.  I would say so if that is what the record shows.

22   Q.  How many hours were you paid?

23   A.  45 times $9 an hour.

24   Q.  October 18 to the 24th.

25             THE COURT:  61 hours from October 18 through

HBDsMED1                    Medina - cross

1   October 24.  Question, counselor?

2              MR. CHUN:  Yes.

3   Q.  On October 18 to the 24th, then you worked 61 hours?

4   A.  If that is what the record shows, then yes.

5   Q.  You worked every day that week?

6   A.  If that is what the record shows, yes.

7   Q.  Do you recall working every day that week in October?

8   A.  Yes, it's possible.  I even have some notes here stating

9   that Mr. Luis worked, so yes, I believe that was a busy time

10  for us.

11  Q.  OK.  It was a busy time.  How many hours were you paid?

12  A.  Again, only 45 hours at $9 an hour.

13  Q.  OK.  Now October 25 to the 31st.

14             THE COURT:  That's 65 hours.

15  Q.  That's 65 hours.  Do you recall working 65 hours from

16  October 25 to October 31st?

17  A.  Yes.  In fact, I worked Halloween day, which I believe is a

18  holiday.  And isn't that date supposed to be paid at time and a

19  half, correct me if I'm wrong?

20  Q.  For which day?

21  A.  For Halloween.

22  Q.  It's not a federal holiday.

23  A.  Oh, OK.

24  Q.  How many hours were you paid for that day?

25  A.  45.

HBDsMED1                        Medina - cross

1   Q.  For that week, 45?

2   A.  45 at $9 an hour.

3   Q.  So is it fair to say, Mr. Medina, that for the month of

4   October, you only had one day off and that was October 12?

5   A.  Yes, that is correct.  And I can provide you the reason, if

6   you would like.

7   Q.  OK.  Now, you have here on the third to the last page,

8   paid?

9   A.  Yes.

10  Q.  A column for paid?

11  A.  Yes.

12  Q.  What is that @paid 10/3/15 four how long dollars, is that

13  what you were paid?

14  A.  On that date, yes.

15  Q.  OK.

16  A.  So, again, if you'll allow me, I would like to state --

17  Q.  Wait a minute.

18  A.  -- why.

19  Q.  OK.  So you were paid $400 on 10/3?

20  A.  Yes.

21  Q.  Then what's the next date, 10/14?

22  A.  I believe that's a seven, so 17.

23  Q.  10/17 you were paid $500, is that correct?

24  A.  Yes, that is correct.

25  Q.  Is that your handwriting on this?

HBDsMED1                         Medina - cross

1   A.   Yes.

2   Q.   Then on the October 19, you were paid $103 --

3   A.   Yes.

4   Q.   -- is that correct?

5        On October 30, you were paid $300?

6   A.   Yes.

7   Q.   OK.   Then September 28, $315, and it says travel?

8   A.   Yes.

9   Q.   What's that?

10  A.   So, as I previously wanted to state, the reason why I wrote

11  it down in this way -- and I forgot the September date was

12  because ending of September through October, the owners were

13  traveling and not available -- so, therefore, they actually

14  instructed me to pay myself on many occasions from the register

15  because they were not available to come in and pay me.

16  Q.   OK.   So September 28 is that you paid yourself $315?

17  A.   I believe so, yes.

18  Q.   Well, do you recall?

19  A.   To the best of my recollection, I believe I did, yes.

20  Q.   Do you recall if that was a Saturday?

21  A.   I don't recall, but I'm sure we could look at a calendar.

22  Q.   Well, how did it happen?   They just told you that they were

23  not going to be there to pay you, so you just to take money out

24  of the register, is that what it was?

25  A.   I believe at this point, they started to owe me back pay,

HBDsMED1                    Medina - cross

1   and I made a call and said, hey, you know, I'm kind of low on

2   cash and you guys haven't paid me properly in a while.  So

3   would I be able to take, you know, a certain amount from the

4   register?  And 315 was the agreed amount.

5   Q.  That's what you took.  Now for 10/3, did you take that

6   money out of the register?

7   A.  I believe so.  Like I said, they were both traveling or

8   in other stores at the time, so the reason why I worked an

9   astounding amount of hours that month was because there was no

10  one available to give me a day off.

11  Q.  OK.  But you didn't write down travel here on the notation

12  for October 3, is that correct?

13  A.  No, because I believe I only wrote it down after the fact.

14  Like I said, you'll notice they are out of order.  So basically

15  what I did was, I went through personal text messages or

16  e-mails that we have from time to time and I realized, oh, he

17  traveled on the 28th of September.  That is why I made that

18  notation stating that, from that point forward, he was

19  unavailable.

20  Q.  All right.  So when did you make these notations on the

21  dates that they were written?

22  A.  The dates for pay were not written necessarily on the day

23  that I took the amount.  They are based on information that I

24  had kept in other places, like notes on a phone, text, e-mails

25  back and forth, things of that nature.

HBDsMED1                    Medina - cross

1    Q.   When was this notation for payments made?

2    A.   When we started to have disagreements for the amount that I

3    felt was owed, when Mr. James Park and Ms. Yo became available

4    to discuss the amounts that I had taken while they were not

5    present and the amounts I felt that I was owed for the time I

6    work.

7    Q.   When was that?   When did you start to feel that you were

8    not being paid what you were supposed to be paid?

9    A.   Actually, once I started working overtime, but --

10   Q.   When was that?

11   A.   I don't remember exactly, but I believe we looked at the

12   records, and it was like the third or maybe fourth week of

13   September, based on this record.

14   Q.   So from that point on, that is when you started to document

15   the payments?

16   A.   Yes.

17   Q.   When were these entries made into this exhibit?

18   A.   I'm sorry?

19   Q.   When were these entries regarding payments made into this

20   exhibit?

21   A.   Which ones, the ones that state which dates I was paid?

22   Q.   Yes, where it says paid.

23   A.   Well, I believe the first time I wrote it was on the third

24   of October 2015.

25   Q.   OK.   Then you go into the next column here, you make a new

1    column on the right on the top, and that is when you start with

2    November?

3    A.  Yes.

4    Q.  OK.  Do you know if you made these notations in the month

5    of November?

6    A.  I don't believe so, because at that time, I believe they

7    came back from traveling or whatever they may have been doing

8    after the second of November, so I didn't feel the need to keep

9    track.  The only reason that I kept track in October in that

10   form was because no one was present to physically give me the

11   money and I didn't want to be accused of stealing.

12   Q.  They came back November 2nd, is that correct?

13   A.  Yes, based on my record and my recollection.

14   Q.  So then from November 1st to November 7th, that is 45 hours

15   from November 1st to November 7?

16   A.  Yes, I believe that's correct.

17   Q.  Is that how many hours you worked?

18   A.  Yes.

19   Q.  OK.  How many hours were you paid?

20   A.  45 hours, $9 an hour.

21   Q.  Business was slow then?

22   A.  Yeah, it was.  It was slow because it was kind of right

23   before the Thanksgiving holiday season and people don't usually

24   shop at that time.

25   Q.  How do you know that?

HBDsMED1                    Medina - cross

1    A.  Well, because I've been in retail after this instance, so

2    based on my experience, just stating.

3    Q.  Retail for cell phones?

4    A.  Yes.

5    Q.  So you work for a cell phone store now?

6    A.  No, not currently, but I did after I worked for Mr. Park.

7    Q.  OK.  We'll get to that.  11/8 through 11/14?

8             THE COURT:  That's 35 hours.

9    Q.  35 hours.  Do you recall now your hours?

10   A.  That's when my hours started to decline.

11   Q.  Your hours are going down?

12   A.  Yes.

13   Q.  How many hours were you paid for that week?

14   A.  I believe I actually was not paid in full.  I don't know

15   the exact amount.

16   Q.  How much were you paid?

17   A.  If I told you, I would be lying, because I don't know.

18   Q.  OK.  Do you have any records?

19   A.  No.  Do you?

20   Q.  So are you saying that -- well, how many hours then were

21   you paid for this week of November 8 to November 14?

22   A.  Would you like me to guess?  Because otherwise it would be

23   a lie.

24   Q.  You said you worked 35 hours.  Did you have a discussion

25   that Saturday with Mr. Park?

HBDsMED1                    Medina - cross

1    A.  Yes.

2    Q.  What happened?

3    A.  He stated that he did not owe me, so this is when we

4    started having conversations about the money issue during the

5    time that they were away and he proceeded to state that he did

6    not owe me for all those hours that I worked in October that I

7    was, in fact, paid in full from the payments that I took myself

8    under his authorization, and he also started to state that I

9    was not working a total of 35, 40, or whatever amount of hours

10   by my record I was claiming to work.

11   Q.  So then what happened at the end of that discussion?

12   A.  Well, obviously, as you might be able to tell from my tone

13   of voice, I was not happy about it, but I considered my

14   position at that time and my finances, and I decided to push

15   forward, hoping that we would come to a resolution.

16   Q.  On that Saturday?

17   A.  Well, on that Saturday, I didn't agree with his statement.

18   And to myself, upon going home I said, you know what, even

19   though he's incorrect, I'm going to continue to work because I

20   need the job.

21   Q.  Do you recall if you were paid anything on that Saturday

22   that you met with Mr. Park?

23   A.  I do remember getting paid, I just don't remember the exact

24   amount.  But as I said, I could take a guess if you would like

25   me to.

HBDsMED1                    Medina - cross

1   Q.  So you don't remember.  Did you deposit any of that money

2   into an account?

3   A.  I don't think so, because from my recollection, it was --

4   it was probably half of those 35 hours, if that.

5   Q.  Did he offer you any amount of money for that week that you

6   worked?

7   A.  He stated that I worked less than 35, then stated a number,

8   which that is what I am stating I don't recall.  I don't want

9   to say a number when I don't recall what he said, and then only

10  paid me for the hours he thought that I worked.

11  Q.  Then what about from 11/15 to 11/21?

12          THE COURT:  That's 44 hours.

13  Q.  Is that correct, Mr. Medina, that you worked 44 hours from

14  November 15 to November 21st?

15  A.  Yes.

16  Q.  Do you recall how much you were paid for that pay period,

17  that week?

18  A.  No.  If I told you, I would probably be lying.

19  Q.  OK.  Did you write it down?

20  A.  Possibly.  I don't see it here.

21  Q.  Because you wrote down here on the previous page, page --

22  A.  I wrote down 11/2015.  Is that what we're speaking of?

23  Q.  Yes.  Previous page, which is the fifth page of your

24  exhibit, you wrote down 11 to 15.  That is $300?

25  A.  Right.

HBDsMED1                    Medina - cross

1   Q.  Is that what you received?

2   A.  That's what I received.  Now, what is unclear is was that

3   for back pay or was that for hours worked currently?

4   Q.  So wait a minute.  Did you receive it on November 2?

5   A.  Yes.

6   Q.  That was the day that Mr. Park came back from traveling?

7   A.  Yes.

8   Q.  You met.  OK.  Then let's see.  Then from 11/15 to 11/21,

9   you worked 44 hours.  Do you recall how many hours, how much

10  you were paid for that week?

11  A.  Well, I wrote down that I was paid $500 on 11/20, but to my

12  recollection, that wasn't for that workweek, as you stated

13  yourself.  The workweek didn't end until the 21st, is that

14  correct?

15  Q.  November 21st is a Saturday.

16  A.  Right.

17  Q.  So you got paid on Friday?

18  A.  I got paid on a Friday, but it wasn't an early payment.  It

19  wasn't like, oh, I feel nice today, I am going to pay you

20  early.  It was because we were having discussions on money that

21  was owed from October, and he agreed to pay me that amount.

22  Q.  You received that?

23  A.  Yes.

24  Q.  Directly from him?

25  A.  Yes.

HBDsMED1                         Medina - cross

1   Q.   You also received on November 10 $600, which was a Tuesday?

2   A.   Yes.

3   Q.   Do you recall that?

4   A.   Yes.  Again, I believe that's all based on funds that were

5   not paid through the month of October.

6   Q.   OK.  So you received these funds now, November 10 and

7   November 20.  Were you, in your mind, paid up through October?

8   A.   No.  Actually, I felt that I was owed some money.

9   Q.   How much was that?

10  A.   Well, based on my calculation, about $1,500.  Now, if we're

11  talking specifically about October, probably half of that.  But

12  like I said, there was also money missing in the month of

13  November, that you would have the last time that I chose to

14  work for the company.

15  Q.   So let's go then to the end.  That's the 11/22 to 11/28.

16          THE COURT:  That's 57 and a half hours.

17          Mr. Medina, for 11/27/15, does that say 12 and a half

18  hours?

19          THE WITNESS:  I'm sorry.  Let me check.

20          THE COURT:  11/27.

21          THE WITNESS:  Yes.  I see that I wrote first ten, and

22  then kind of wrote a two over it because I probably miswrote

23  it.

24          THE COURT:  Then that is 57 and a half from

25  November 22 to the 28th.

HBDsMED1                     Medina - cross

1    BY MR. CHUN:

2    Q.  So you worked 57 and a half hours.  November 28, that was a

3    Saturday.  That was the Saturday after Thanksgiving?

4    A.  Yes.

5    Q.  That was your last day?

6    A.  That's correct.

7    Q.  OK.  Were you paid on November 28?

8    A.  To my recollection, no.  I believe he said because he was

9    also aware that there was a balance owed from October as well

10   as some of November, that we would get together and discuss

11   that at a later date.

12   Q.  OK.  So how did it come about that November 28, 2015, was

13   your last day working?

14   A.  Well, that was the last day I ever worked.  I didn't work

15   after that.

16   Q.  Did you give a two-week notice?

17   A.  No, I did not.  I wasn't required to.

18   Q.  Did you give a one-week notice?

19   A.  I don't believe so.  I don't think I was required to.

20   Q.  So did you notify anybody on November 28 that this was

21   going to be your last day at work?

22   A.  To be honest, I'm not sure, but I believe since he chose

23   not to pay me on that date, that's when I would have informed

24   him and said, you know what, I don't think I'll be working for

25   you any longer.

HBDsMED1                    Medina - cross

1   Q.  OK.  Is that, in fact, what you did?

2   A.  Yes, because I didn't work anytime after that.

3   Q.  Well, I would like to know a little bit more than I guess.

4   You worked that week, this is the week of Thanksgiving.  You

5   worked Saturday, the 28th.  You worked ten hours?

6   A.  Yes.

7   Q.  Do you recall what those hours were, it was from ten to

8   six?

9   A.  That was what day?  I'm sorry.

10   Q.  The last day you worked.

11   A.  What day was that?

12   Q.  November 28th, 2015.  You wrote it down the last day.

13   A.  I'm not asking the date, I'm asking --

14          THE COURT:  That was a Saturday.

15   A.  So Saturdays are very busy days, and we would work from

16   very early until late.  So yes, I worked ten hours on that day.

17   Q.  OK.  Then when did you meet with Mr. Park about payment?

18   A.  Sometime during that Saturday before the end of the day.

19   Q.  OK.  He told you that he wasn't going to pay you for that

20   week?

21   A.  Not in those exact words, but he said I'm unable to pay you

22   at this particular time, something to that respect, and as far

23   as money that you're claiming I owe you, we will speak on that

24   at a later time.

25   Q.  OK.

HBDsMED1                        Medina - cross

1   A.   Then I went home, thought about it, and I said, you know

2   what, I don't think I am going to work any longer with these

3   individuals.

4   Q.   OK.  Did you go out to eat dinner with Mr. Park your last

5   day that you worked, that Saturday, November 28th, 2015?

6   A.   I do remember going out to eat with Mr. Park.  I don't

7   recall what day it was.

8   Q.   Was it before you decided that you were no longer going to

9   work here?

10  A.   Yes.

11  Q.   Then you just informed Mr. Park by phone call?

12  A.   I believe so, yes, or possibly text.  Unfortunately, I

13  don't have that text available.

14  Q.   OK.  On the last day that you worked, did you ask Mr. Park

15  for any documentation like a pay stub?

16  A.   No.

17  Q.   OK.

18  A.   I did not.

19  Q.   Did you mention anything about payments from February

20  through August that you believed that you were owed?

21  A.   I mentioned that he had been misrepresenting the total

22  number of hours that I had worked, but I don't think I ever

23  specifically stated, you owe me X amount for that time.  I only

24  went based off the record that I started to keep in September.

25  Q.   All right.  So then let's go with November 10, 2015.  You

HBDsMED1                          Medina - cross

1   received a payment of $600.  Where did you apply that money?

2   A.  Again, part of that could have been in my bank account and

3   part of that was probably spent in cash.

4   Q.  No, I am talking about you got paid $600 you said on

5   November 10, but that was not for the week of November 10?

6   A.  No.

7   Q.  So what was it for?

8   A.  It was for the enormous amount of hours that I worked in

9   October.

10  Q.  OK.  What about for the payment of November 20, 2015?

11  A.  Again --

12  Q.  That was also for October?

13  A.  -- that was also probably for October.

14  Q.  Well, when you say it was probably for October, what does

15  that mean?

16  A.  Well, I can't say for certain.  I am only going based off

17  what was written down and the fact that I know that I wasn't

18  fully paid for the hours worked in October.

19  Q.  OK.  Then you have here November 2, 2015, payment of $300?

20  A.  Yes.

21  Q.  What is this, December 3, 2015, $1,500?

22  A.  Right.

23  Q.  What's that?

24  A.  So after, if you turn to the back page, you'll see that I

25  have a total amount owed of $3,115.  When we sat down and spoke

HBDsMED1                    Medina - cross

1    about that on the third of December, he said based on his

2    records and what I had worked total ever, I guess, or I would

3    say he only owed me 1,500, and he provided that in cash.

4    Q.  I notice that you put that down.  This is your handwriting

5    for the notation of the $1,500, is that correct?

6    A.  Yes.

7    Q.  Did you write down for the notation when you took $600 --

8    when you were paid $600 on November 10, did you write down what

9    form it was, 20s, 50s?

10   A.  On November 10?

11   Q.  Yes.

12   A.  I didn't write down what form it was in, no.  As far as the

13   denomination, it was in cash, I can tell you.

14   Q.  For November 20, did you write down any notation as to what

15   bills it was?

16   A.  No, I did not.

17   Q.  OK.  This payment, December 3, 2015, $1,500, that was the

18   last payment you received?

19   A.  Yes.

20   Q.  Is this record based on your records, are you saying that

21   it is $1,515 total money owed?

22   A.  Yes, but I don't think I factored in the fact that there

23   was overtime.  I just multiplied at the normal rate.

24   Q.  So then what is the overtime rate?

25   A.  Well, if it is time and a half, I think you stated

HBDsMED1                         Medina - cross

1   previously it would be about 1350.

2   Q.  OK.  So then how much is it then that is total money that

3   is owed?

4   A.  I didn't do the calculation, but I believe my lawyers might

5   have.

6   Q.  OK.

7          THE COURT:  Do you have anything further on cross?

8          MR. CHUN:  I do, just a few more questions.

9   Q.  When you were in the store and if it wasn't Mr. Park or

10  Mr. Yo or Ms. Colonie, it was just you?

11  A.  That's correct.

12  Q.  Did you ever ask for your employer to hire somebody else to

13  work with you?

14  A.  Yes, on several occasions, but I was told that the store

15  was not busy enough.  And in some respect, that was true,

16  because it went up and down.  Some days were very busy and some

17  days were not as busy.

18  Q.  Did you ever work in the other location, in the

19  Poughkeepsie location?

20  A.  We spoke about it, but I never actually got to go to the

21  location and work or even visit.

22  Q.  OK.  Or the other one as well that you didn't mention, in

23  Pennsylvania or New Jersey, did you ever work in the New

24  Jersey/Pennsylvania location?

25  A.  No, I did not, but I did have communication with the

HBDsMED1                         Medina - cross

1    employees that worked there.

2    Q.  Did you hire the employees that worked there?

3    A.  No, that wasn't my responsibility.

4    Q.  OK.  Did you, as part of your duties, did you pay

5    Ms. Colonie?

6    A.  Never.

7    Q.  Did you ever receive any monies directly from Ms. Colonie?

8    A.  No, I don't believe so.

9    Q.  OK.  Did you ever hire or fire anybody while you were

10   working at East Communication, Inc.?

11   A.  No, sir, I was not management.

12   Q.  You were not management?

13   A.  No, not by title or...

14   Q.  I want you to take a look at the time sheet.

15   A.  Which one?

16   Q.  Exhibit 5.

17   A.  OK.

18   Q.  I want you to go through and tell me which data from time

19   to time didn't work and which one from time to time worked?

20   A.  Do you want me to go through all of it?

21   Q.  Yes.

22   A.  Are you sure?

23        THE COURT:  Counselor, this is five pages long.  Can

24   you ask a specific question?

25   Q.  Yes.  He is saying he was asked what are some examples on

HBDsMED1                    Medina - cross

1    direct and he pointed to one example of the time being correct

2    and one example of the time being incorrect.  I want to know,

3    based on his memory and his log, which he doesn't have anything

4    from February through August, I would like to see where he

5    believes the times that he says did not work, did not work, and

6    the times that he says did not work, worked.  All I am seeing

7    is a handwritten log that, as we all know, can be handwritten

8    at any time.

9              THE COURT:  Counselor, I believe when Ms. --

10             MR. CHUN:  The record is not in evidence.

11             THE COURT:  Ms. Isaacson first presented Exhibit 5 to

12   the witness.  He said he wasn't familiar with this.  He didn't

13   write it.

14             MR. CHUN:  OK.  Then he looked at it and said yes.

15             THE COURT:  We're not just going to have a

16   free-for-all on five pages.  Ask some specific questions.

17             MR. CHUN:  OK.

18   BY MR. CHUN:

19   Q.  Mr. Medina, this log time sheet, the first entry,

20   February 24 at 3:15 in the afternoon --

21   A.  OK.

22   Q.  -- do you recall if that was the first date that you were

23   employed?

24   A.  I don't believe it was the first day I was employed, but it

25   was the day that I was provided with log-ins or the ability to

HBDsMED1                           Medina - cross

1    clock in and out.

2    Q.  Was Mr. Park with you on that time when you clocked in?

3    A.  Yes, I believe she was the one that showed me how to use

4    the system.

5    Q.  Was she there with you when you clocked out?

6    A.  Yes, I believe so.

7    Q.  OK.  You'll notice that you clocked out approximately

8    49 hours later?

9    A.  Well, that is probably because that day he showed me how to

10   clock in, but possibly did not show me how to clock out or he

11   may have forgotten.  It was a long time ago.

12   Q.  It was a long time ago?

13   A.  Yes.

14   Q.  September 2015 was also a long time ago?

15   A.  Yes.

16   Q.  So do you recall him telling you on February 24 about how

17   to clock out?

18   A.  How to clock out?

19   Q.  Yes.

20   A.  Possibly, but the system might have malfunctioned.  As I

21   mentioned, it had a habit to do so.

22   Q.  So this is your first day dealing with the system?

23   A.  Yes.

24   Q.  Are you saying that it malfunctioned?

25   A.  Based on my recollection and the fact that the information

HBDsMED1                    Medina - cross

1  is inaccurate, obviously I didn't clock out two days later at

2  four something, yes.  The system was malfunctioning, and

3  probably why I clocked out at that time, that is when it

4  started to function properly.

5  Q.  OK.  Was Mr. Park there with you when you attempted to

6  clock out?

7  A.  Possibly, yes, because that is during the first week or so

8  of my training.  So he was there for most of that time.

9  Q.  From February 24, 2015, are you saying that you knew how to

10  clock out?

11  A.  Yes.  I was shown how to clock in and out, but that doesn't

12  mean that I was able to.

13  Q.  When you were not able to, you discovered that you were not

14  able to, was Mr. Park right there with you?

15  A.  Yes.

16  Q.  What happened?

17  A.  He said, oh, the system is acting up.  We'll get it

18  corrected.  I'll fix it.

19  Q.  OK.  So then on February 26 is the next log-in?

20  A.  OK.

21  Q.  Which is the same time as the log-out.

22  A.  OK.

23  Q.  Did you, in fact, log in at 4:03 on February 26?

24  A.  Yes, because what was done was, I was instructed to clock

25  out and clock back in at that time in an effort to fix the

HBDsMED1                        Medina - cross

1    error.

2    Q.  All right.  Then did you clock out at 11:58:55 p.m. on the

3    same day?

4    A.  I did not.  That seems to be an automatic clock-out time

5    before midnight because the system was still malfunctioning.

6    Q.  OK.  So when you did clock out on February 26, do you

7    recall clocking out on February 26?

8    A.  Yes.  I clicked clock-out and it clocked me out, and then

9    I clocked back in a few seconds after, as the records shows.

10   Q.  No.  I'm talking about when you clocked the out on the

11   26th.  Now it says 11:58:55.  Do you recall clocking out on

12   February 26?

13   A.  I recall attempting to clock out, but it malfunctioning.

14   Q.  What time was that that you attempted to clock out?

15   A.  Probably around closing time, 8:00.

16   Q.  Was Mr. Park there?

17   A.  He may have been.

18   Q.  Do you recall on that date if anybody was there besides

19   you?

20   A.  I don't believe I was alone.  Can I say, in fact, who was

21   there?  No, because it wasn't always Mr. Park.  Sometimes it

22   was Mr. Luis Yo.  It could have been Luis or it could have been

23   Mr. Park.

24   Q.  This is around your first week of working.  You don't

25   recall on the 26th, when you tried to clock out at night, who

HBDsMED1                          Medina - cross

1   was there with you, if anybody?

2   A.  I know I was not alone.  As I said, during the first few

3   weeks, I did not have the codes or keys to lock the store or

4   open it.

5   Q.  OK.

6   A.  Therefore, there is no way for me to have been alone.  Can

7   I state for a fact if it was Mr. James Park or Luis?  No, I

8   cannot.

9   Q.  OK.  What about Ms. Colonie, was she there?

10  A.  I don't believe so.

11  Q.  So it could have been Mr. Yo or Mr. Park or one of those

12  two was there?

13  A.  Yes, to my knowledge.

14  Q.  To the best of your knowledge.  All right.  Then February

15  27, you clocked in, it says here, at 1:01 p.m., is that

16  correct?

17  A.  Yes.  I believe --

18  Q.  Did you actually clock in at 1:01 p.m., or did it

19  malfunction and then clock in automatically?

20  A.  No.  I believe we were still trying to fix the issue so,

21  therefore, I received a call probably from Mr. Park stating

22  that possibly it had been fixed and that I should attempt to

23  clock in.  And as you can see, it allowed me to clock in, but,

24  once again, did not allow me to clock out.

25  Q.  It didn't allow to you clock out.  Did you work from

HBDsMED1                         Medina - cross

1   February 27 to March 6?

2   A.  I believe so, yes.  I might have had a few days off because

3   at that time, I was not working every day because I was new,

4   but I did work during that time period, yes.

5   Q.  But the clock-in function, was that working?

6   A.  The clock-in function for some reason worked.  It was

7   mostly the clock out, but it also did malfunction to clock in

8   from time to time.

9   Q.  So from the period of February 27 to March 6 is seven days?

10  A.  Yes.

11  Q.  Did you work during any of those seven days?

12  A.  I did, but as I stated, if you don't clock out, you can't

13  clock in.  So since the system did not allow me to clock out,

14  there was no way for me to clock in on the days that I worked

15  during that time.

16  Q.  Your last clock in date was 11/28/2015 at 11:02, is that

17  correct?

18  A.  I don't believe that was correct.  I do know that was the

19  last day that I worked, but as my personal record shows, I was

20  there until probably eight because I worked a full ten hours.

21  Q.  OK.  So are you saying that, then, fine, this is the second

22  to last day, November 27.  You clocked in at 8:07, that works,

23  that was correct?

24  A.  So I don't think I would have been at the store that early.

25  Again, I feel that that is a system error, because although I

HBDsMED1                        Medina - cross

1    did get to the store quite early sometimes, I did live far.  I

2    don't believe I got to the store at eight in the morning.  That

3    seems out of place.

4    Q.  OK.  Did you clock out at 11/28/2015 at 11 o'clock in the

5    morning?

6    A.  Possibly in an attempt to clock out in order for me to be

7    able to clock back in.

8    Q.  OK.  You have to clock out in order to clock back in?

9    A.  Yes.

10   Q.  So then the previous entry is you clocked out at 11/25 at

11   11:59 p.m.

12   A.  So do you really think that I was in the store at

13   11:59 p.m.?

14   Q.  I'm trying to understand a better sense of your clocking

15   in.

16   A.  It doesn't allow me to clock in unless I clock out.

17   Q.  So when did you clock out?

18   A.  Well, by your own knowledge, you'll see that the system

19   clocked me out automatically on that particular instance at

20   11:59 p.m.

21   Q.  OK.

22   A.  There is no way I was in the store at that time.

23   Q.  You can see that information from when you clocked out and

24   when you clocked in?

25   A.  It will show you, yes.  When you walk in, it will say

HBDsMED1                         Medina – redirect

 1   clocked out at that time, and then I would just be, like, what

 2   the heck, I was not here.  And I just assumed, oh, it was

 3   probably an automatic thing trying to repair itself, and then I

 4   would proceed to try to clock in.  Sometimes it wouldn't let

 5   me.  Just sometimes it would not let me clock out, it would not

 6   let you clock out.

 7   Q.  That's when you said it was a malfunction?

 8   A.  Exactly.

 9   Q.  OK.

10          MR. CHUN:  I have nothing further.

11          THE COURT:  OK.  Ms. Isaacson, how much time would you

12   need on redirect?

13          MS. ISAACSON:  Maybe five.

14          THE COURT:  Approximately how many minutes?

15          MS. ISAACSON:  Probably five minutes.

16          THE COURT:  We can finish up with this witness.

17   REDIRECT EXAMINATION

18   BY MS. ISAACSON:

19   Q.  Mr. Medina, you testified that the store was open from ten

20   to eight, except on Sundays, correct?

21   A.  Yes, that's correct.

22   Q.  So when you record in your notes in Plaintiff's Exhibit 6

23   that you were working ten hours, does that include the time

24   that you spent opening and closing the store each day?

25   A.  No, it does not.

HBDsMED1                        Medina - redirect

1   Q.   Approximately how many hours did you spend each day opening

2   and closing the store?

3   A.   I would say it took, on a slower day, about 20 to

4   30 minutes to close, and on a busier day, because there was

5   more to clean or more money to count, it possibly could have

6   took up to 45 minutes to an hour.

7   Q.   Is that for both opening and closing?

8   A.   Well, mostly for closing.  Opening is a little bit shorter

9   most of the time.

10  Q.   OK.  So would it be correct to say that when you recorded

11  you worked ten hours, it was more like 11 hours including

12  closing and opening?

13          MR. CHUN:  Objection.

14  A.   Yes.

15          MS. ISAACSON:  No further questions.

16          THE COURT:  OK.  Thank you, Mr. Medina.  You may step

17  down.

18          (Witness excused)

19          THE COURT:  I suggest that we can take a lunch break

20  now briefly before we call the next witness.  Do you have any

21  other witnesses that you are going to call?

22          MS. ISAACSON:  No, your Honor.

23          THE COURT:  OK.  You rest at this time?

24          MS. ISAACSON:  Yes.

25          THE COURT:  We'll take a brief lunch break, and we'll

1    start the defense case when we come back.  Let's say 1:30.

2              (Luncheon recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             (1:30 p.m.)

3              DEPUTY CLERK:  This court is now back in session.

4              THE COURT:  Are we ready to start the defense case at

5     this point?

6              MR. CHUN:  Yes.

7              THE COURT:  Okay.  Then how many witnesses are you

8     going to be calling?

9              MR. CHUN:  One.

10             THE COURT:  Okay.  Please go ahead.

11             MR. CHUN:  Defendants call Mr. James Park.

12      JAMES PARK,

13         called as a witness by the Defendants,

14         having been duly sworn, testified as follows:

15      DIRECT EXAMINATION

16      BY MR. CHUN:

17             THE COURT:  Welcome, Mr. Park.

18             THE WITNESS:  Thank you.

19             THE COURT:  Please speak clearly into the microphone

20      so everyone can hear you.  Thank you.

21      BY MR. CHUN:

22      Q.  Mr. Park, good afternoon.

23             What is your relationship with East Communication

24      Inc.?

25      A.  I started first by helping out a friend, a family friend,

1    he is -- Mr. Yo, he's a musician, so he opened a store but he

2    wasn't physically there to oversee the daily operations, so I

3    had some time with me at that time, so I asked to help out.

4    Q.  And did there come a time when you met with Mr. Medina?

5    A.  Yes.  So right after the construction was done, I was

6    learning all the rules, the corporate rules, and we were

7    required to have a minimum of two people on staff plus the

8    owner.

9         So I was in the -- I was looking for somebody, and the

10   next door business the CNC Market Research.  The management,

11   the manager, she came up to me and she asked me what I thought

12   about hiring Mr. Medina.  And she explained the full situation.

13   She said the job description, they have to go outside to grab

14   people to come in, there's a lot of snow on the ground and

15   because of his limited physical abilities he wasn't able to

16   perform his job at the market research place, so asked me, you

17   know, why not hire him.  And I spoke to him, his legs were weak

18   but he's a smart guy, you could tell, so I said why not, I will

19   give him a part-time position.  That's how it started.

20   Q.  When was this?

21   A.  I believe February.  I believe February.

22   Q.  And when you first met Mr. Medina, where did meet him?

23   A.  Well, so I asked the -- at that time the neighbor, the

24   manager, may we speak to the guy.  So I literally had a

25   conversation with him outside the store, right in front of the

1   store.  And I just happened to be there, I spoke to him.  I

2   asked him why -- I had my doubts, why she wants to get rid of

3   him, but after speaking to him for about 15, 20 minutes, I said

4   why not, let's give him a shot.

5   Q.  Was there discussions at that time about number of hours

6   worked and hourly pay?

7   A.  Yes.

8   Q.  What was that?

9   A.  I knew because I could tell that he had physical

10  disability, so I thought I can't give him a lot of hours.  So I

11  was going to give him -- to fill up his hours that I wasn't

12  going to be there.  That's how it started.  I said I will train

13  you, and I will give you the -- I will train you first, let's

14  see how that goes.

15          Yeah, that's how it started.  Then I told him that I

16  cannot give you a lot of hours, but you are going to get more

17  hours than at market research, but I cannot give you a lot of

18  hours, but is that okay?  I kind of liked him at that point

19  because I told him my job doesn't require you to walk around

20  and grab people in the cold, you stay back there and speak and

21  smile at the customers, you're bi-lingual, so that's what I

22  needed at the time.

23  Q.  And what was then the agreement, if any, regarding hourly

24  pay?

25  A.  The hourly pay was just like $9 an hour, that's it.

HBDTMED2                         Park - direct

```
 1    Q.  What was the agreement, if any, regarding the form of
 2    payments?
 3    A.  Talking about overtime?
 4    Q.  No, talking about how was the money -- in what form was he
 5    paid?
 6    A.  This was a tricky situation.  He told me this whole story.
 7    He said I came here illegally because of my physical situation
 8    then I lived here illegally at a certain point, then --
 9               MR. ANDROPHY:  Objection.
10               THE COURT:  Then I got my green card through marriage.
11    I'm in the process of getting my citizenship.  So could you
12    just pay me cash?  That's what he asked me.  Because market
13    research paid slightly above the $9, right, but after taxes it
14    would equivalent less than $9, so he asked me $9 in cash.
15    That's the price we agreed on.
16               MR. ANDROPHY:  Your Honor, we move to strike any
17    testimony about Mr. Medina coming here, supposedly saying he
18    came here illegally.
19               THE COURT:  Overruled, but I'll take it under
20    advisement.
21    Q.  Was that discussion during first meeting that you had with
22    him?
23    A.  Yes, I told him with anybody who bring in -- I told him,
24    you be honest with me, I will reciprocate that back.  Tell me
25    everything up front, then we could work things out.  And
```

HBDTMED2                        Park - direct

1   because they were cutting his hours more and more and more from

2   the job that he was -- he held at that time, he wanted to start

3   immediately as soon as possible.

4          Then I had a child on the way, I needed -- I said why

5   not, I could be home a little more.  So that's how it started.

6   Q.  And after that meeting that you had with him in front of

7   the store, do you recall about how much time later was that

8   Mr. Medina started to work?

9   A.  I believe I spoke with Luis, the guy who started the store,

10  and I told him, you know, he is on crutches, but he's a very

11  smart guy, and that's -- he's bi-lingual, we could use that, we

12  could use his help.  I think after a week later, maybe, at the

13  latest, I gave him a call and I said could you start whenever,

14  then he agreed, and that was it, you know.

15  Q.  Then take us through the beginning stages of when he

16  started to work.

17  A.  So usually when they come in I give them a brief

18  description of -- job description, just tell them what is what

19  is expected of an employee, customer service, the actual stock

20  in the back, the actual sales, it's better sometimes better to

21  lose a sale but you have to be courteous to customer service

22  because there's a lot of competition in that area, and one of

23  the biggest complaints with the other competitors of Metro PCS

24  is that their employees are rude.  So our business model was

25  let's be respectful to the customers, let's be honest about our

HBDTMED2                          Park - direct

1    product, our merchandise.

2              And Mr. Medina, he is an eloquent speaker, he's also

3    bi-lingual, customers liked him, and they also recognized him

4    because for many years, I don't know for how long, but he

5    actually worked right next door.  So most people, because

6    Parkchester is like a closed area, there's a lot of buildings,

7    and most of the customers, they knew Ely because there's not

8    that many -- they recognized him and they liked the fact that

9    he was at the store and he was actually bringing people in, so

10   I liked that.

11   Q.  Was he responsible for opening the store?

12   A.  Sure.  We discussed this, and I told him hey -- I was kind

13   of -- at the beginning I didn't want to keep saying that hey,

14   you're disabled, I didn't want to put it out that way, I said

15   can you do this, that's the first thing I asked.  And at that

16   time he left lived in Westchester somewhere, so we discussed

17   it:  Is it better for you to open the store and leave in the

18   middle of the day so you could get home earlier, or is it

19   better you come in the middle of the day and close?  And he

20   said well, it doesn't matter, as long as he had a job and the

21   hours, that's all he cared about.

22   Q.  So what was he assigned do?

23   A.  So after a few weeks of training, I gave him -- there's

24   only like three copies of the key, so I gave him one of them,

25   and he was asked to open the gate, there's two gates, one that

1    covers about 75 percent of the face of the store, another gate

2    covers about 25, the main gate never worked, it still doesn't

3    work today, so he was just asked to -- if you unlock it, if you

4    move your hand up, the gate just rolls right up.

5    Q.   Is that the main gate?

6    A.   That's the small gate to get into the door.  You walk in,

7    as soon as you walk in the alarm will start beeping because

8    there's a keypad on the left side of the wall, you punch in the

9    code, then there's about another ten feet to the counter, maybe

10   13 feet if you go around the counter, and that's how you start

11   the day.

12   Q.   And did there come a time when Mr. Medina learned about

13   clocking in for work?

14   A.   That's one of the first things we teach an employee,

15   because every time you make a sale you have to use a system

16   called Wireless Standard, then we provide the employee with an

17   ID and a password.  They use that.  Every time they make a

18   sale, it show up on the system.  They will scan, for example,

19   they -- a customer bought a phone and I put -- the phone comes

20   with their own what we call an IMI number, your scan the IMI

21   number and the price would come out and how much he got, he

22   received from the customer.

23        You can only do the transaction if you only have to

24   physically log in.  We always tell them, a lot of times

25   companies that have something that people call ASRs, they're

1   mystery shoppers, they come into the store unannounced and they

2   say customer complaint that you were not open on time.  So our

3   proof that you were open on time is using the wireless, as soon

4   as you walk in after you punch in the alarm code.  The first

5   thing you're instructed to do is sign into Wireless Standard,

6   that is you punch in the time you walked in.

7   Q.  I see.  You referred to ASR, what is that?

8   A.  Account sales, they work for the actual Metro PCS

9   corporation, they send the workers, they do weekly visits,

10  sometimes unannounced visits.

11  Q.  So is the clock-in the same, the Wireless Standard, as it

12  is that you have to input for a sale?

13  A.  Yes.  It's the same program.  So there's two different

14  programs, one program is actually run by the company Metro PCS,

15  another program is contracted by -- a third party company

16  contracted by Metro PCS to run the time management.  That's how

17  you match the register at the end of the night.

18  Q.  And was Mr. Medina given a password and --

19  A.  Yes, every Metro PCS employee in the whole country is given

20  one.

21  Q.  Is that password known only to him?

22  A.  Yes.

23  Q.  Does it change?

24  A.  Yes.

25  Q.  Did he in fact change it?

A.  I don't know.  I was giving the initial log-in ID and the

password, and so that's how I know.  When we know we know if he

punched in, for example, 10:03, I could assume that he was at

least ten minutes before opening the gate, punching the alarm

clock, by the time he walked to the computer, he would have

punch in.  That's how I know.  And there are times when a

customer would complain about a store, sometimes -- a lot of

times about the wrong store, and I would get a call, and I

would show them the log-in, the time punched in, and say hey,

he was there on time or whoever was on time.

Q.  I see.  And with respect to the training for Mr. Medina,

about how long did that last?

A.  Usually, we train about -- we start about 20 hours a week,

about five hours at a time.  Because the store is not busy from

open to 8.  It doesn't work that way.  On a busy day a combined

hour, you work about three hours.  For about seven hours you

just sit there and watch videos all day.  That's what people

do, most of the employees, that's what they do.  So we pick a

time of the day, we say it's going to get busy from let's say 3

to 8 or 2 to 7, and we ask the trainees to come in at that time

until we feel comfortable they're ready to run the store on

their own.

Q.  And when Mr. Medina was being trained, who was the one who

was training him?

A.  I did.

1    Q.  And did there come a time when Mr. Medina was qualified, in

2    your opinion, to work at this place and get more hours?

3    A.  Sure.  He was -- I was satisfied after the training that he

4    knew his stuff, he knew how to talk to customers, he was able

5    to finalize the sale, he seemed very trustworthy.  One of the

6    hardest things is find is not -- after the bi-lingual, but

7    trustworthy factor.  So he was trustworthy.  He was always

8    there on time.  I had my doubts in the beginning, but he proved

9    me wrong every single time.  He was right on time.  And I said

10   I think I could have him work all day and if he wanted to.

11   Q.  And do you recall when that was when he began to work all

12   day?

13   A.  To be honest with you, I don't know the exact date, but

14   knowing how I work, maybe after the second week, no later than

15   the third week he would have start working on his own.

16   Q.  And what does that mean when he's working on his own?

17   A.  So I will tell him you work let's say Monday and Tuesday,

18   can you do open to close.  At that time it agreed upon, because

19   the corporate side wants a manager type or the actual operating

20   owners to be there constantly.  I'm always in and out.  I'm

21   always in and out.  And I expect him to be there at 10 o'clock,

22   and he was always there, then I would show up say at midday,

23   bring some -- replenish the store with more phones and

24   accessories, and that's how it was.

25   Q.  When he was able to work on his own, what was his work

1  hours?

2  A.  Well, we usually give the employees an option, do you want

3  to work small hours more days, or do you want to work full

4  days, less days.  Mr. Medina's choice was full days, less days.

5  Q.  And what's a full day?

6  A.  Eight to ten, sorry, ten to eight.

7  Q.  So then in the beginning, when he was able to be on his

8  own, what were the days Mr. Medina worked?

9  A.  Usually -- at that time my wife was about eight months

10  pregnant, so I remember I wanted the Monday off, the Monday off

11  and Saturday off.  So I would ask that he would open and close

12  on Mondays, and I would give him the option, do you want every

13  other day?  That's the thing that kills me about this because I

14  would never give straight days like that.  It's mentally

15  draining to work as a sales rep at Metro PCS, so our list is

16  alternate days Monday and Wednesday or Tuesday and Thursday, or

17  at most Monday, Wednesday, Friday or Tuesday, Thursday,

18  Saturday.  Sometimes when I expect a busy day to fall on a

19  Friday or Saturday, I have them work Monday, Wednesday and

20  Friday so I could use the extra help on Friday and Saturday.

21  So if he was working Tuesday and Thursday, he worked Saturday

22  and stuff like that.

23  Q.  Do you recall in the beginning what Mr. Medina's -- how

24  many days per week that he worked?

25  A.  He did not work more than three days full.  That's a fact.

HBDTMED2                         Park - direct

1    Q.  So that's --

2    A.  I'm not here saying my recollection, my recollection none

3    of that, he worked three days full time hours.  The most he

4    ever did was three days and a Sunday, which is six hours.  It

5    was -- sorry, yes, six hours, 11 to 5.  It's not 12 to 6 it was

6    11 to 5.

7    Q.  So let's take it from the beginning when he started to work

8    and he was -- you saw he was able to do this on his own.

9    A.  Yes.

10   Q.  He worked three to four days per week?

11   A.  Yes.

12   Q.  Is that your testimony?

13   A.  Right.  So if it's full days more than that, that extra day

14   would be on a Sunday.  Sunday, which is we'll call -- I could

15   say half a day, because it's only six hours, because we open

16   late and close early.

17   Q.  Okay.  Mr. Medina was okay with this?

18   A.  Yes.

19   Q.  Now what was the frequency of the payments that were made

20   to Mr. Medina?

21   A.  So he asked to be paid in cash, he asked that himself, and

22   I'm on the record, so I was -- I didn't know better.  I should

23   have kept -- I should have given him a check regardless.  It

24   was an easy matter of me writing it out and just submitting the

25   check or ask to have a check written, but I thought I was

helping the guy.  And I didn't know, and because he seemed to

be responsible and a good salesperson, I thought I could just

do this as a favor.

There was one time where I remember the time when -- I

even told the plaintiff, too, there was a time in my life and

my family life where we had green card issues, so I remember

that when he told me about that, so I felt sympathetic about

it.

So I -- you tell me, and I already know what days he

worked, because it would either be him or myself or Mr. Luis.

So I know the days I worked, I know the days Luis worked, the

rest -- the rest of the days are the days Ely worked.  There

shouldn't be any questions what days or when he worked.

Q.  If he wanted to work more hours, what's the procedure for

him --

A.  I would give him my days, but I would still be there and

show up to work late.  That's how it worked.  But that only

happened three or four times, only three or four days, that's

considered busy days after he started, which was the 4th of

July weekend and the week before the Labor Day weekend, that's

what we call our back to school special.

As Mr. Medina stated, the summer is the slowest time

of the year.  There's no reason for us to have employees

working a lot of hours.  And from a business standpoint, all

the expenses are there while the income is not there.  This is

HBDTMED2                        Park - direct

verifiable.  Metro PCS, they post their profit every month.

It's a simple fact, the cell phone business only does well in

September, in December, and about March.  We call that the tax

season.

Q.   Okay.  So the first time you paid Mr. Medina, tell us what

happened.

A.   Because of all that's happened, I can't recollect, but I

know I told him I would pay you for training.  He actually

demanded that.  He was actually negotiating with me.  Usually I

tell -- I say can I try you for a day or two, because if this

isn't going to work out, I don't want to spend all this money

on you to train you, because I have to send you to training, I

have to pay for training.  But I told him, you know what, let

me train you myself first, afterwards, but I'm -- I still want

to pay you for training, and if it doesn't work out, you just

made your money and that's it.

        And you have to understand my mentality at the time.

I needed the help, yes.  He was very smart, yes.  But I was

taking a big risk, because with the mobility issues and stuff

like that, I wasn't sure if he could do it.  Because the chair

is uncomfortable.  A lot of times I told people that all the

time, if you walk into a cell phone store, you don't see any

other sales representatives, they're not sitting down, they're

standing all day, eight or ten hour shifts.  I have my chairs

behind the counter, you could sit here, as long as you put on a

HBDTMED2                        Park - direct

1    big smile when customers come in, that should be okay, they

2    won't know that your legs are hurting.

3              So I'm going off track.

4    Q.  So the first time you paid him, was that for the training?

5    A.  For the training, yes.

6    Q.  What was the arrangement in terms of payment period?

7    A.  The first six to eight weeks I was there all the time when

8    it was time to get paid.  Very simple.  I show up, and the last

9    day -- the way he wrote it is incorrect.  If he works on a

10   Tuesday and Thursday, he doesn't work until the following week,

11   I will either be there on Thursday, and say hey, you worked

12   let's say three days, here's the money.  That's how it would

13   work.  The last day you worked, that day, that's the day you

14   would get paid.  When I saw those numbers on the dates, I don't

15   know where he came up with those numbers.

16   Q.  Okay.  Let's just take this back from the beginning.  The

17   first time you paid him, what was the arrangement in terms of

18   when he was going to be paid?

19   A.  You are going to get paid at the end of the week, end of

20   the week, whenever the end of the week was.

21             But now I remember, so the first few months, because

22   he started -- because he started a relationship with the market

23   research, he was still working for them part time, I think this

24   could be verified, and he was going back and forth.  So he was

25   still in the neighborhood even though he wasn't working at the

HBDTMED2                      Park - direct

store.  So my last day, instead of getting paid every Saturday,

he could have been paid one day earlier or sometimes two days

earlier, as long as he wasn't working Friday or Saturday.

          Is that clear?

Q.  So then every week, what is the week -- the days of the

week that comprise the week period?

A.  First to 7th, 8th to 15th, 16th to 23rd, 24th to 31st.

That's how we divided it.

Q.  Thank you.  Now when you talk about full shift being ten

hours, is there a break period or a lunch period?

A.  So I tell them if you ever need -- if you have to eat, put

up a sign that I'll be back, lock the door, go get something to

eat, come back, or sometimes bring it back into the store.

That was the policy.

Q.  And was that period of time included in the ten hours of

pay?

A.  Yeah, I just -- there's no point of deducting, because

sometimes like Mr. Medina, said he has to stay 10, 15 minutes

later, for me to give the 15 minutes past ten hours or for me

to deduct the 30 minutes or whatever minutes that he wanted a

lunch break, just it was too much to calculate.  So ten hours,

you are expected to open at 10 and you are expected to close at

8.

Q.  Okay.  What do you mean by close at 8?

A.  So I do tell my employees always lock the door around 7:30,

latest 7:45, because you have to count the money, put the money

aside, and stuff like that.  But if somebody walks in at 7:35,

don't just lock the door on them because a lot of time the

employees lock the door and people are banging outside and

clearly see someone inside, that gets them frustrated, and that

anger carries over to the next day.

So I just tell my employees if it's something minor,

take care of it.  Because there's only two types of

customers -- actually no, that's incorrect, three types of

customers, one about 90 percent of the foot traffic that walks

into the store, they're what we call bill payment, they come in

to tell us their phone number, the system will show them how

much they owe, they pay and walk out.  One minute maximum.

That's the 90 percent of the store traffic.

The other ten percent are the people actually buying

phones.  That takes about 30 to 45 minutes at tops, from point

they walk in and you actually try to make the sale and the

activation takes 30 to 45 minutes.  And if they -- if a

customer wants to buy a phone at 7:45, you know for sure you

could close a deal, tell them you know what, stay.  If you are

past 8, then that day you worked eleven hours.  And that was

agreed upon, and then I will compensate them eleven hours.

That was agreed upon.

Q.  Okay.  Now for the beginning part when he was in training,

before he was able to be on his own, did you pay the full

1   amount for the times that he was there?

2   A.  Of course.  I told him a lot of owners, they don't pay full

3   amounts when people are being trained because they don't know

4   how it's going to go, they pay less than the actual minimal

5   amount, I told him.  And it was a tricky situation, because he

6   was referred to me by my next door neighbor, right, which at

7   that time I didn't know they were going to move somewhere else.

8   As far as I was concerned, they wanted to be there as long as I

9   was going to be there, and I have to see them every single day,

10  right?  And didn't want to mistreat the guy, it makes no sense,

11  right?  So I said I will pay you those same wages like you're

12  an actual employee from the moment of training.

13  Q.  Okay.  And he in fact was paid, and you were the one that

14  gave him the money.

15  A.  Yes.

16  Q.  Did he say anything in response when he received the money

17  during the training period?

18  A.  To be honest, until I got served with the papers, I had no

19  idea this was going to happen.  He never actually talked about

20  hey, you know, there's a discrepancy of hours.

21          Now he says he quit.  I don't know where he's getting

22  that.  I don't understand how --

23  Q.  And we're going get there soon.

24          Now when he started and he was able to come on his

25  own, what was -- he was paid how frequently?

HBDTMED2                    Park - direct

1    A.  Every week.

2    Q.  Every week.  Was there a specific day of the week that he

3    was paid?

4    A.  Right.  So if he would -- let's say his last day that week

5    was a Saturday, if I was there, I will pay him myself.  If,

6    let's say, his last day was a Friday and I wasn't there,

7    there's no point of him to come all the way back there for his

8    paycheck on Saturday, so I tell him take the money, you worked

9    X amount of amount of hours, take the money, and that's it.

10   Q.  So at the time when you paid him, was there -- what type of

11   discussion was there on the dates that you physically paid him

12   the money?

13   A.  There weren't that much discussion in detail.  Can I get

14   paid now because I'm not working tomorrow?  Sure.  Because his

15   hours are pretty much set, except some occasions.  For example,

16   my kid was sick so I -- so his hours would be set between 30 to

17   35 hours, some hours can you cover for me a little more, maybe

18   40 hours?  Except those -- some days was busy.  There was -- I

19   remember when he was -- Mr. Medina was testifying he logged in

20   at 8 o'clock.  He worked that day.  I know because that was

21   black Friday, I believe, if I'm not mistaken.  So he did walk

22   in, he punched in, and was working correctly.

23   Q.  So when it came to the points on the dates that you

24   physically gave him the money, what was the sum and substance

25   of the conversation?

HBDTMED2                      Park - direct

1    A.  Thank you very much, you did a great job.  Thank you.

2    Q.  How did you know how much to pay him?

3    A.  Because X amount of hours he worked.  He worked three days,

4    three days times nine, $270, that's it.

5    Q.  What about on the days that he worked more than three days,

6    did he tell you that?

7    A.  Of course he did.  I know that -- how many days he worked.

8    Some days he worked 40 hours.  He would never go past 40 hours.

9    Q.  Why is that?

10   A.  Because I'm not stupid.  I grew up here, I know the basic

11   rules, overtime rules.  Anybody knows that.  If you go past 40

12   hours, you have to give him time and a half, I know that.

13   Q.  Was there any policies for the store regarding overtime and

14   authorization for overtime?

15   A.  Any policy about overtime, or --

16   Q.  Strike that.  So then what policy is there, if any,

17   regarding overtime work?

18   A.  There wasn't overtime.  Of course I pay them time and a

19   half, sure, but we wouldn't constantly be that way.

20   Q.  Was it required for authorization to work overtime?

21   A.  Yes, I have to tell you and I will know in advance for that

22   particular week if you are going over 40 hours.

23   Q.  So did Mr. Medina, at any of the time during the

24   approximately nine months that he was working, request

25   overtime?

1    A.  No.

2    Q.  During any of the nine months did you request Mr. Medina to

3    work more than 40 hours?

4    A.  So I'm under oath now, so maybe once or twice, that

5    particular -- when I say once or twice, maybe one week we went

6    by a few hours, there was -- there seems to be a question about

7    was it 55 and 50 hours, it would never be that much.  If there

8    was any question it would be 38 or 43, tops.  That's what it

9    would be.

10              I'm sorry, 46.  So four full days and one Sunday, that

11   would be actual overtime, yes.

12   Q.  And for that time period, if he did work for that, do you

13   recall how much he was paid?

14   A.  Yes, multiply that by nine, and the actual six hours

15   overtime I would put it -- I think it was like $13 or $14,

16   that's how I gave it to him, yes.

17   Q.  Do you recall approximately how many times during the time

18   that Mr. Medina was employed that you paid him personally?

19   A.  Maybe about quarter of the times the entire time he

20   actually got paid and took money home, maybe a quarter of the

21   times I was actually there and handed the money myself.

22   Q.  Now for the remaining times, for the payments, how was he

23   paid?

24   A.  Hey, James, can I get paid?  Yes, you can.  That's it,

25   after a certain period of time.  Because maybe the first few

1    times, the first maybe the first five, six times he got paid I

2    was actually there, because he was just -- there was a trust

3    factor involved here.  After a while I trusted him, I became

4    friends with him.  I know how many hours he worked.  That's not

5    a dispute, right?  Then hey, can I get paid now because I'm not

6    working tomorrow?  Sure, take the money.  Because the following

7    day when I pick up the money I will notice the amount is short,

8    that's why I automatically assume Ely got paid.

9    Q.  So that conversation was started via the telephone?

10   A.  Yes.  There was no text involved, no, I would -- I had the

11   same phone for the past two years, I would have kept that

12   record.

13   Q.  During the times that you did not personally pay him, did

14   he -- did Mr. Medina actually take the money that he said he

15   needed?

16   A.  That he needed?

17   Q.  Yes.

18   A.  Well, so what we call our own protocol would be let's say

19   he will call me and either I don't pick up the phone or I'm not

20   available, he has two other phone numbers he could call, that

21   would be Luis or Colonie.  Colonie is my other employee that

22   works at a different location, and I have been with her over

23   the years, too, so there's a trust factor involved with her as

24   well.  So that's how Mr. Medina would get paid.

25   Q.  Now you heard testimony earlier about Mr. Medina that

1    starting the second week of April he said he worked 45 hours.

2    Do you recall if during the second week of April Mr. Medina in

3    fact worked 45 hours?

4    A.  No, Monday, Wednesday and Friday, or the Tuesday, Thursday

5    Sunday, or a Tuesday, Thursday and Saturday.  Any other

6    alternate days I would be there.

7         You have to understand, the company's always there

8    checking to see if the owners are there.

9    Q.  With the ASR?

10   A.  Right, the ASR or the mystery shoppers, they demand that a

11   partner or someone who is above a sales associate always be

12   there with the sales associate.  Now if they would have found

13   out -- if they knew that one particular person was working all

14   these hours, they would have shut me down a long time ago.

15   That's a fact.

16   Q.  During the time that Mr. Medina was employed here, from

17   training through the end, what complaints, if any, did you

18   receive from the ASR?

19   A.  Nothing.  Well, about the store in general or about the

20   employee?

21   Q.  About the employee.

22   A.  There was some sanitary issues in the beginning, but it's

23   not important talking about this.  No, no complaints, no.

24   Q.  Okay.  Mr. Medina testified earlier that beginning in the

25   month of May through June he worked approximately 50 hours per

1   week, that he testified.  What recollection, if any, do you

2   have regarding this particular period from May and June of

3   2015?

4   A.  He did not work those hours, period.  He did not.

5   Q.  Can you describe for us the employee time sheet and the

6   process?

7   A.  So when employee besides myself -- I have my own ID log-in

8   as well.  So when somebody works at the store, we're given that

9   code so they could verify.  So when an owner goes to the store

10  the following day to pick up the money, we count the money and

11  say we know this should be X amount of dollars inside the

12  store, say put aside from the previous day or two days went on.

13          The way we do that is we go through the actual system

14  and see the sales log, then he needs to -- that's how we know

15  what was sold that day, that's how we know how much money came

16  in, that's how we know how much payments came in.  We put the

17  numbers together and that equals how much is actually put in

18  the cash drop box and whatever, and that's how.

19          So they need to log in for them to be able to process

20  that.  If they didn't do that, then that means I have all this

21  cash that's over, so that's the sale that's not accounted for.

22  Q.  You testified earlier about there's two different systems

23  with the sale and then with the log-in.

24  A.  Right.

25  Q.  One of them you said was --

HBDTMED2                     Park - direct

1    A.  They're both log-ins.

2    Q.  One you said was through Metro PCS, and one of them you

3    said was through a third party that was contracted by Metro

4    PCS.  So for the log-in for the time sheet, which one is that?

5    A.  It's the third party company, it's called Wireless

6    Standard.

7    Q.  Thank you.  With respect to the time sheet for Mr. Medina,

8    have you seen Exhibit Number 5?

9    A.  May I see it, please?

10   Q.  Can you tell us what you know regarding whether the system

11   was working from time to time?

12   A.  To be honest, I got this record after I got sued.  There

13   was never -- there was no reason for me to look at the time

14   sheets until before I got sued.  There was never an issue.

15   There was no problems about stores being open, there was never

16   issues about the store being closed.  After I looked at them, I

17   started raising a lot of questions.  Why is he not signing out

18   properly the way he was instructed to?  I started to begin to

19   think he planned this all along.  That's what I thought.

20   Q.  What communications, if any, did you receive from

21   Mr. Medina regarding the time sheet and the log-in procedure?

22   A.  There was never -- he never told me anything about any

23   problems about Wireless Standard.  Never.  It doesn't make

24   sense for one particular computer to fail one particular

25   employee where he works for me, and this is -- there could be a

1    wide outage of problems because it's handled by a third

2    company, but that's something that I would have heard about.

3    For him to say that only sometimes it worked, sometimes it

4    doesn't, that's not the case.  When you punch in, that one here

5    now, you punch in now, punch out.  It's a matter of you just

6    saying you X out the program and it punches you out

7    automatically.

8    Q.   Okay.  Do you recall the one or two times that you said

9    that you may have paid -- that he may have worked overtime?

10   A.   Right.  So I know for a fact the last month, right, the

11   last month of November, that week he worked overtime.  I don't

12   understand why he's here saying that he quit.  I knew from two

13   months prior to that he was no longer going to work for us.

14   Q.   So that was one instance.  Do you recall the other

15   instance, if there was any, regarding overtime?

16   A.   Maybe -- the only thing I could think of is my daughter was

17   born in July, so that day when -- she was born on Wednesday, so

18   if -- I would probably ask him to work the following day.

19   Q.   So did Mr. Medina ever tell you at any time when it came

20   for payment that he had worked more than 40 hours?

21   A.   No.

22   Q.   I asked about May and June.  Now if I turn your attention

23   to July, the month of July, Mr. Medina stated that he worked 55

24   to 60 hours for the first and second week of July and

25   approximately 45 hours for the third, fourth and fifth weeks of

1    July.  Did you hear that?

2    A.  Yes, I heard.  That's incorrect.  So when he was talking

3    about the days in July, the only week that makes actually sense

4    that he could have worked 46 hours instead of 36 hours is

5    July -- the third week of July is when my daughter was born,

6    which is the 23rd.  Any other day, any other time -- so even he

7    said all the sudden he was working 55 hours and dropped to 35,

8    no, 35, is the constant number of the hours he was always

9    scheduled to work.

10   Q.  So when he was paid, either by you or when he took the

11   money, that was based on a calculation of 35 hours, was that

12   your understanding?

13   A.  Right.  If you worked three days and a Sunday, yes.  If you

14   worked three days, just for 30 hours.

15   Q.  Okay.  Now I turn your attention to month of August 2015.

16   Mr. Medina stated that he worked approximately 45 hours a week.

17   Is that correct?

18   A.  So that's actually right.  If my memory serves me

19   correctly, he took time off sometime in August to go visit his

20   family in Florida.  And this is -- I bring this up because

21   right after he came back, that was when he informed me that he

22   was going -- that he was no longer going to live with his

23   grandparents, he was going to move back to Florida.  And I said

24   how much time can you give me?  I think I'm going to my best to

25   survive until November.  And that's how he end up working until

1    November.  He didn't just quit.  No.

2    Q.  If you look at page 3 of the time sheet, you'll notice

3    that --

4              THE COURT:  Exhibit 5 you're talking about?

5              MR. CHUN:  Yes.

6    Q.  You'll notice that there's a gap from August 11 to

7    August 23.

8    A.  I think that's what it is.  We could probably call TSA and

9    find the travel records.  He was gone about a week, maybe a

10   week, more than a week, I forget.

11   Q.  Was he paid for that week?

12   A.  No.

13   Q.  Now Mr. Medina testified that starting around -- sorry,

14   we'll move to September, that he worked on the first and second

15   weeks of September, 40 hours, and the third and the fourth

16   week, so the last week being from September 20 to the 26th, 55

17   hours that week.

18   A.  That doesn't make any sense.  Like I said before, all cell

19   phone stores, the busiest peak drops right off the first week

20   of September and constantly slow until black Friday,

21   Thanksgiving.

22   Q.  Do you recall during the month of September who was in the

23   store?

24   A.  Again, I would most likely schedule him Monday, Wednesday

25   and Friday, and I would work Tuesday, Thursday and Saturday.

HBDTMED2                    Park - direct

1   And the alternating weeks I would work Monday, Wednesday and

2   Friday and he would work Tuesday, Thursday, Saturday and

3   Sunday.  That's how it was.

4   Q.  Is it correct that the store is open for a total of 66 of

5   hours during a week?

6               MR. ANDROPHY:  Objection, leading.

7               THE COURT:  Rephrase the question.

8   Q.  Do you recall from the week of September 27 to October 3rd,

9   that seven days, do you recall during that week, from Sunday to

10  Saturday, how many hours the store was open?

11  A.  The mandated hours that we reported is Monday through

12  Saturday, 10:00 a.m. until 8:00 p.m., and Sundays from 11:00 to

13  5:00 p.m.  At that time, those are the operating business

14  operating hours.

15  Q.  So is that a total of 66 hours?

16  A.  66 hours.

17  Q.  So Mr. Medina, from the week of September 27 to

18  October 3rd, stated that he worked 70 hours.  What is the

19  response to that?

20  A.  I don't know where he got those numbers.  Maybe he's adding

21  those numbers, I was closing the store and it took me one hour

22  to open the store, one hour to close the store after -- before

23  business hours or after business hours.  That's something I

24  would have known about.  And for at that time when it's slow,

25  for him to say that I was there past 8:00 just doesn't make

1    sense.  We could probably get those records seeing if there was

2    any activations on the particular week after 8:00.  There was

3    none.

4    Q.  What do you mean by "activation?"

5    A.  Whenever there's an activation, there's a time stamp.  If

6    he would have done some kind of phone sale past 7:45, any time

7    after that, there would have been a time stamp.  And the system

8    is set up so that there's something called Q pay payment

9    system, it shuts off, at 8:30 or 9:00 o'clock it shuts off.

10   Even if you wanted to sell phones, you can't do it.

11   Q.  Is that your store policy or --

12   A.  Metro PCS corporate policy.

13   Q.  Okay.  I had a question about something else.  Regarding

14   the cash deposits, does that include the people that pay their

15   phone bill, the 90 percent?

16   A.  Yes.

17   Q.  Thank you.  So do you recall if during the week

18   September 27 to October 3rd, that Sunday through Saturday, that

19   the store was open for 70 hours?

20   A.  That's incorrect.  There's no way.

21   Q.  Do you recall Mr. Medina stating that he was paid for 45

22   hours?

23   A.  I don't understand how someone claims to work X amount of

24   hours that I intentionally say you know what, either I give you

25   less money for less hours and you don't bring an issue about

1    it, number one; number two, if I give you the sole full power

2    to take the money from the register, why not take the full

3    amount?  I don't understand that.  I really don't understand

4    it.

5    Q.  Okay.

6    A.  So if he in fact did work all those hours, he could have

7    taken all that money, right?  Then I would have brought that

8    issue up the following day.  I would have say, you know, you

9    only worked 35 hours but you took money for 55 hours, or you

10   understand?  Or vice versa, if I did not want to pay him more,

11   if I wanted to just steal from him and deduct ten hours or 15

12   hours, I would have made sure I was there to make sure he

13   didn't take all that money.  But that wasn't the case.  I gave

14   him the full authority to say you know what, you worked X

15   amount of hours, that's what you get paid, take the money, and

16   that was it.  And there was never an issued raised by me for

17   eight months.

18   Q.  Was there any issue raised by him for the eight months?

19   A.  Never.  August he goes to Florida, or at least he told

20   me -- he told everybody else was going to Florida.  He comes

21   back seven to ten days later and says I decided to move back

22   with my family, my family is in Florida.  I said good for you.

23        Then, as I stated before, first initial agreement, why

24   he asked to be paid in cash, right, because citizenship issues

25   and stuff like that, and everything was -- that month he came

HBDTMED2                          Park - direct

1   to my store flashing the United States citizenship papers, and

2   I congratulated him.  I said, you know what -- maybe I thought,

3   because I had a point to this, maybe if he wasn't -- I thought

4   I was being a good guy.  I thought I was helping him out by

5   paying him cash.

6   Q.  Now what disputes, if any, arose starting in September of

7   2015 with you and Mr. Medina?

8   A.  I was -- I got hit by a truck when I saw the serving

9   papers.

10  Q.  This is September of 2015.

11  A.  September 2015 there was no issues.

12  Q.  Now I want to turn your attention to the month of October

13  2015.  Mr. Medina stated that from October 4th to October 10 he

14  worked 65 hours.  October 11 through October 17, 53 hours.

15  October 18 through October 24, 61 hours.  October 25 through

16  October 31, 65 hours.

17  A.  Those numbers, at least to me, doesn't make sense.  Because

18  either it ends with zero, because you worked a full day, 30

19  hours, or 36 hours.  I don't know where 53 is coming from.  He

20  doesn't work partial days, he was never like that.

21  Q.  I'll turn your attention to September 17, 2015.  Mr. Medina

22  states that he wrote it down in his log, he worked from 10:00

23  a.m. to 2:00 p.m., James worked from 2:00 p.m. to 6:00 p.m.,

24  and then he worked from 6:00 p.m. to 8:00 p.m.  Is the James

25  that he's referring to you?

HBDTMED2                          Park - direct

1    A.  Yes.

2    Q.  So do you recall the events of September 17, 2015?

3    A.  You know, I wouldn't say that's incorrect, but that hardly

4    never happens.  So it may have been a case where he probably

5    asked me, I probably asked him could you work that day, he was

6    supposed to work that day then he had something going on and he

7    asked me to come in.  That's the only way something like that

8    would happen.

9    Q.  Now regarding October 21st, 2015, Mr. Medina writes in his

10   log he worked from 10:00 a.m. to 2:00 p.m., Luis worked

11   10:00 a.m. to 2:00 p.m., he worked 2:00 p.m. to 8:00 p.m.  Do

12   you have any recollection regarding the events of October 21st?

13   A.  Not that particular day.  If I would guess, either Luis was

14   supposed to work that day full day, then he asked Mr. Medina to

15   cover from 2 to 8, or again, vice versa, Mr. Medina was

16   supposed to work that day full day, but for whatever reason he

17   couldn't, so he covered for him from 10 to 2.

18   Q.  Do you recall if during the month of October Mr. Medina

19   worked more than 36 hours per week?

20   A.  No.

21   Q.  No, you do not recall?

22   A.  No, I know for a fact he did not.  So the reason I say that

23   is because now I'm getting ready to replace him because he's

24   going to leave me the month before.  This is the process where

25   we start finding new employees and training somebody.  There's

1    no reason for him, for me, the trainees to be here, that's too

2    many people.  There's too many people working in one small

3    store with low volume.

4    Q.  What was the procedure regarding --

5    A.  The procedure would have been to work Monday, Wednesday and

6    Friday.  If I worked Tuesday, Thursday and Saturday, the

7    trainees come in Tuesday, Thursday and Saturday.  That's how it

8    worked.

9    Q.  Understood.  Now I want to turn your attention to last

10   month that he worked, November 2015.  Did you receive anything

11   from Mr. Medina in writing about him possibly ending his

12   employment?

13   A.  He told me two months, three months prior to that that he

14   was getting ready to go back to Florida.  And he did in fact

15   tell me:  For the last month, can you give me as many hours

16   possible?  That's because in November, even then I did not go

17   past 40 hours, because business was slow, then that probably

18   black Friday was probably his last day here.

19        I think it was -- I'm not sure, you could look it up,

20   the 28th, was that a Friday?  If it was a Friday --

21   Q.  It was a Saturday.

22   A.  Maybe the following Saturday we probably decided to open

23   earlier, because that's the only time we open earlier all

24   season, maybe two days.  He knew he was leaving, I asked him to

25   help as much as you can, because we had other employees then.

HBDTMED2                          Park - direct

1   Q.   So for the first week of November, Mr. Medina stated he

2   worked 45 hours.

3   A.   Incorrect, no way.

4   Q.   And that you paid him 45 hours at $9 an hour.

5   A.   No.  I mean I wish I could have written down all those

6   hours myself, too, you know, I could write one right now and

7   submit it to the Court.

8   Q.   From November 8 to November 14, Mr. Medina stated that he

9   worked 35 hours, and --

10  A.   That's the only time that sounds correct to me.

11  Q.   -- and didn't know how much he got paid.

12          Do you recall -- so this is the --

13  A.   Come on.

14  Q.   -- third to the last week that he was employed.

15          Do you recall whether you paid him personally on that

16  day or was money taken from the register?

17  A.   Well, I cannot say for sure that if I directly handed the

18  money to him or he was asked to take the money from the

19  register based on his total hours.  But either way, he got

20  paid.  He would have said something to me.  With his character,

21  with that mouth, there's no way he would not have said

22  something.  He let me know all the time if things were off.  He

23  would have said something months before, from the first

24  incident on.

25  Q.   Was there ever a circumstance where you paid him late?

1   A.  You know, maybe, maybe.  So maybe it was like this, I was

2   supposed to be there Saturday to pay him, right, maybe for

3   whatever reason I did not go.  I tell him hey, can I pay you

4   next week?  Maybe that happened once, maybe twice, but it was

5   never habitual.  He got paid week after week.  He took the

6   money or I handed it to him myself.

7   Q.  Did he leave a receipt for the times that he took money?

8   A.  Right, so there's something called Q pay receipt paper.  It

9   was -- Ely took $360, or $270, he would put inside the

10  register, that would add to the total we're supposed to find

11  the next day.  So if we're for $270 short, for example, I would

12  have Ely's signature saying something that I would have

13  crumpled up and thrown away, but I should not have done that.

14  Q.  Now I'll turn your attention to last week that he worked,

15  November 27, 2015.  Mr. Medina wrote down in his log he worked

16  twelve and a half hours.  That's the day after Thanksgiving.

17  A.  That makes sense.  Thanksgiving we're closed, obviously, so

18  the following day -- nothing really happened, but I do remember

19  that particular black Friday because we had two different girls

20  that were supposed to be out there, and Mr. Medina stayed

21  inside the store and they rotate.  That's the only time we

22  could get away flagging Parkchester outside the actual store.

23  So I remember that day.  Probably the following day or the week

24  after we all went out for dinner.

25  Q.  Now the last day he worked was November 28, 2015, that's

HBDTMED2                     Park - direct

1    ten hours, he says, on a Saturday.

2              Was he paid on that particular day?

3    A.  Yes.  That was the last thing it was going to be.  Of

4    course I would have paid him.  He was normally going to work

5    for me.

6    Q.  Do you recall what time on Saturday you gave him money?

7    A.  The only thing that I cannot tell the Court for sure is

8    that we went out.  I called everyone that worked for me in the

9    New York area to have dinner to send him off because he was

10   moving to Florida, and I can't recall if it was after the 28th

11   or the week before.  Maybe it was before the 28th.  I have my

12   credit card receipts.  I'm sure, knowing me, I would have not

13   scheduled the company dinner a week before a major busy week, I

14   would have probably scheduled it afterwards.

15             So even afterwards, all the money was paid, he brings

16   his fiancée or girlfriend there, I bring my own family there,

17   all the employees are there, we are happy.  Ely, good luck to

18   you.  Then two months later I get hit with serving papers.

19   Never seen it until -- then the market research store moved to

20   another location, like Mr. Medina stated, maybe a block away,

21   another cell phone store came in.  I saw him as an employee

22   right next door.

23   Q.  You saw who as an employee?

24   A.  Mr. Medina.  I was shocked.  But that was after I got sued

25   already, so I didn't talk to him after that.

HBDTMED2                     Park - direct

1   Q.  I see.

2            THE COURT:  Do you have anything further?

3            MR. CHUN:  I do, I'm reviewing my notes for one final

4   time.

5   Q.  So Mr. Park, as we stand here today, what payments, if any,

6   are missing that should be paid to Mr. Medina?

7   A.  There's no payments.  All the money -- if anybody is owed

8   money, it would actually be me, if I look back.  Every time he

9   made a major mistake at the store -- and the actual president

10  wanted him fired -- I'm the one that defended him.  He would

11  let people walk away with merchandise, with expensive phones,

12  and big mistake.  I'm the one who shielded him.

13           When you buy a phone, you're expected to process the

14  month payment -- the month payments before 8:30 that day before

15  the business day.  If you don't do that, the entire sale gets

16  lost, so the store owners, they're not compensated for that

17  particular sale.  And Mr. Medina made plenty of -- handful of

18  mistakes.  There's only one person working there, so we could

19  look back and see how much those mistakes up to.

20           Those add up to thousands of dollars.  I'm the one who

21  protected him.  Never, never said a word, say you know what

22  you're doing okay, right?  Because to me, trust was more

23  important to me than an employee that doesn't make any

24  mistakes, so I thought at that time.

25  Q.  Was there a period of time in September or October where

HBDTMED2                    Park - direct

1    you were traveling and you instructed Mr. Medina to --

2    A.  I think I took my family -- no, wait, there's no way that

3    particular year I traveled somewhere, because my daughter was

4    less than a hundred days old.  I would not have traveled

5    outside of New York nowhere.

6    Q.  November 2nd, 2015, so this is the last month he worked,

7    Mr. Medina stated and wrote down in his log, payment of $300.

8    Do you recall that?

9    A.  I probably did.  To be honest, don't know, either took the

10   money or wrote that down or I gave to him myself, either or.

11   Q.  What about December 3rd, 2015, so after he worked,

12   Mr. Medina stated that he received $1,500.

13   A.  Now that's a funny thing.  That last week, that big chunk

14   was the last payment I gave him the last day, and I added about

15   another few hundred dollars in there, it was like a send off

16   gift saying hey, you did pretty well for the past eight months.

17   That's why I did that.

18   Q.  Now there was a payment he also referred to November 10,

19   $600, and November 20, $500.  Do you recall those payments on

20   those dates?

21   A.  Well, not the dates exactly, but sure, yeah, I mean if

22   there was -- when Ely was there, there was never an issue about

23   money that was not accounted for.  So I just said to add all

24   the numbers up to see what it adds up in the entire month.  But

25   it's correct, I would have said something that there was money

HBDTMED2                        Park - direct

1    missing that I took or Ely took for his pay.

2    Q.  Were you informed?

3    A.  No, he's good for that.

4    Q.  Were you informed that he was taking money for back

5    payments?

6    A.  Like I stated, I did not know there was an issue about this

7    overtime stuff until I got served with papers.

8    Q.  And other than the one or two times that you stated he may

9    have worked overtime, what hours and what weeks, if any, did he

10   work overtime?

11   A.  If he works overtime it would have been 46 hours or --

12   there's no, it's not -- 46 hours.

13   Q.  Do you recall how many times he worked 46 hours?

14   A.  Maybe once or twice in the third week of November and the

15   first week of July.

16   Q.  Besides the $9 an hour, were there any other payments made,

17   such as disability?

18   A.  No.

19   Q.  And for the time that he worked, did Mr. Medina receive a

20   1099 or any tax document?

21   A.  No.  He asked me specifically not to do that.  I have this

22   idea, I have a Social Security, I have it, I still have it.  He

23   told me not to report it because it was going to hurt him

24   getting his U.S. citizenship in August.  This was way before.

25   And he told me he was getting some kind of medical benefits

HBDTMED2                          Park - cross

1   that was going to hurt that.  So what I didn't understand

2   what -- I know he was being paid through check while working at

3   the market research place, but maybe not making enough hours,

4   maybe that's why it was.

5          MR. CHUN:  Thank you, I have nothing further.

6          THE COURT:  We can take a two-minute break.

7          (Recess taken)

8          THE COURT:  Mr. Androphy, do you have

9   cross-examination?

10          MR. ANDROPHY:  Yes, your Honor.

11          THE COURT:  Okay.

12   CROSS-EXAMINATION

13   BY MR. ANDROPHY:

14   Q.  Mr. Park, you're familiar with the clock-in, clock-out

15   system that was used at your store, correct?

16   A.  Yes.

17   Q.  And that would work -- the way that would work is each

18   employee would have a specific code that they would put in, log

19   in?

20   A.  They have a log in and password, yes.

21   Q.  And so someone could only log in as themselves, correct?

22   A.  Yes.

23   Q.  You wouldn't we able to log in yourself as Mr. Medina?

24   A.  No.

25   Q.  And Mr. Yo wouldn't do that, correct?

HBDTMED2                         Park - cross

1    A.   Each of us have our own ID and password.

2    Q.   You have Plaintiff's Exhibit 5 in front of you, correct?

3    A.   Yes.

4    Q.   Do you understand that this document is a report from the

5    cell company as to the log-in times and log-out times for

6    Mr. Medina?

7    A.   This is actually a printout from the Wireless Standard, the

8    software where you log in Medina and click, it tells you your

9    total hours worked, press click and gave me this.

10   Q.   So you printed this out from the Wireless Standard?

11   A.   Yes.

12   Q.   And this is a document you had access to as a person in

13   charge of the East Communication store, is that right?

14   A.   Yes, anybody who has their own log in or password could

15   access this information.

16   Q.   And this is a record that was kept by East Communication in

17   its regular course?  Not the printout itself, but the log-in

18   information?

19   A.   Yes, can't be altered, can't be -- this is handled by a

20   third party.  We pay them monthly, and that's how it works.

21           MR. ANDROPHY:  We ask that Plaintiff's Exhibit 5 be

22   admitted?

23           THE COURT:  Any objection?

24           MR. CHUN:  No objection.

25           THE COURT:  It's admitted.

HBDTMED2                          Park - cross

1          (Plaintiff's Exhibit 5 received in evidence)

2     Q.  If you take a look on the first page of that document,

3     starting on March 23rd, 2015, do you see that?

4     A.  March 23rd, yes, sir.

5     Q.  I will represent to you March 23rd, 2015, was a Monday,

6     march 28 was a Saturday, and within that period there are log

7     ins on March 23rd, correct?

8     A.  Yes.

9     Q.  March 24?

10    A.  Yes.

11    Q.  March 25?

12    A.  Yes.

13    Q.  March 26?

14    A.  Yes.

15    Q.  March 27 and March 28, correct?

16    A.  Yes.

17    Q.  So on six days, six consecutive days there are log ins for

18    Mr. Medina for that week, correct?

19    A.  Yes.

20    Q.  And Mr. Medina would have been the one to make in the log

21    ins, correct?

22    A.  Yes.

23    Q.  No one else was able to do that?

24    A.  No.

25    Q.  Going now to April 7 through 11 -- and I will represent to

HBDTMED2                    Park - cross

1    you April 7 was a Tuesday and April 11 was Saturday -- you see

2    there are five days, each consecutive day, each day from

3    April 7 through April 11?

4    A.  Yes.

5    Q.  And log ins made by Mr. Medina?

6    A.  What I don't understand here is how do you log in -- punch

7    in at 9:47 and punch out at 8:21?

8    Q.  Is there a specific entry?  You're referring to the

9    April 2nd?

10   A.  Yeah, April 3rd.  So that means he was only there -- or he

11   was actually past 24 hours.  Doesn't make sense.

12   Q.  I think -- tell me if you disagree.  I think it's fair to

13   say this does not record every single clock in and clock out.

14   Is that fair to say?

15   A.  It does not represent every clock in and clock out.

16   Q.  For example, you pointed out April 3rd, 2015, the clock in

17   is 10:37, there's no clock out for that day?

18   A.  Yes.

19   Q.  There's some missing entries, correct?

20   A.  Yes.

21   Q.  But every entry you agree was made by Mr. Medina, correct?

22   A.  I could find out right now what his password is, it's a

23   matter of downloading the software, seeing what the password

24   is.  I'm trying to find out, each of us supposed to have our

25   own log in and password.  I don't know what was created as a

 1   password for him.  I don't know if it's generic password or

 2   not.  But only if you're -- let's say Mr. Medina changed it to

 3   something, a difficult password that nobody knew, it would be

 4   only him logging in, but if it was a standard easy password,

 5   who knows?

 6   Q.  Did you log in under Mr. Medina's name yourself?

 7   A.  I didn't, no.

 8   Q.  Did you have reason to believe that Luis Yo ever logged in

 9   under Mr. Medina's name?

10   A.  I can't speak for him, but I don't understand why he would

11   do that.

12   Q.  Wouldn't make sense for anybody to log in as Mr. Medina,

13   correct?

14   A.  Right.

15   Q.  And you're not aware of any way that Mr. Medina could have

16   logged in remotely, are you?

17   A.  You can, if you download the software to your computer.

18   Q.  Okay.  Do you know that for a fact that you can log in

19   remotely for this?

20   A.  Yes, right.  Actually thought about this when I printed

21   this out.  I was trying to understand why there are so many

22   hours overlapping and this was all messed up.  And it just

23   occurred to me that Mr. Medina is actually tech savvy.  He was

24   going to school, or he was before, he was in school prior,

25   something with programming, computer related.  So it took me a

HBDTMED2                          Park - cross

1    few -- it took me a while to figure out how he could alter

2    this.  All it takes is you get the license key from the

3    software go to your home computer, download the software, and

4    put that key in and it will work, just like the way it works at

5    the store.

6    Q.  I believe you testified about five minutes ago that no one

7    could alter this once its entered.  Is that your testimony?

8    A.  Sorry.  So what I meant to say was if you are properly at

9    the store, if you log in with that, you cannot.  But I was

10   trying to understand how this was possible for a very long

11   time, because you have to understand, I thought a friend of

12   mine was working at the store until I got hit with papers, then

13   I found this on top of it.  I was trying to understand how this

14   was.  So I thought he was planning this the whole time to come

15   after me, to go after the East Communication, and I thought

16   that was the only -- that could be a way to mess up all the

17   time clocks so he would have actually a leg to stand on.

18   Q.  What did you realize that?  When did you come up with --

19   A.  I don't know, when I got served papers, I think February or

20   March sometimes.  Then after I got the attorney I was asked

21   hey, can you prove how many hours he worked?  I said yes, I

22   could find out where he punched in, where he punched out, then

23   I found this.  So it took me some time to realize that you

24   could do it that way to alter the time clock, yes.

25   Q.  So after some time of being sued, you came up with this

1    theory maybe Mr. Medina was logging in remotely?

2    A.  He acted like a friend until he served me with papers, so

3    anything is possible.

4    Q.  Can you answer the question?  You came up with this theory

5    after you were being sued he logged in remotely to create these

6    time records?

7    A.  My own thoughts, yes.

8    Q.  Okay.  And you brought evidence of that today, correct?

9    A.  I was just trying to merely point out the fact that if

10   you -- there's a back doorway to alter the time clock, yes,

11   because he testified earlier saying the computer will work, the

12   computer doesn't work, and I never had an issue with all the

13   employees before and he's the first one.

14   Q.  And you have been aware of this lawsuit for at least 16

15   months or so, correct?

16   A.  Yes.

17   Q.  And so in that 16 months you have brought in evidence to

18   show that this is possible, that Mr. Medina logged in from

19   outside to create false records?

20   A.  I really thought this was a clear cut case.  I know I paid

21   him.  He knows that.  And I -- when I first contacted my

22   attorney, I said you know what, I have the time to prove all

23   the days he worked, and the sure thing turned out to be like

24   this.  I started thinking how can this be?  Why are you punched

25   in for 24 hours or entire week consecutively?  If he would have

1   signed in at another terminal location and left that there,

2   then that means this is how he would have looked.  This is not

3   him punching in this particular time, this is just overlapping

4   of time where when you overlap it's punched in, it seems to me.

5   That's what it seems to me right now.

6   Q.  Where do you see an example here that are overlapping as

7   opposed to him actually punching in?

8   A.  So for example, March 27, from 4:10 p.m. the following day,

9   9:40, 9:42, then March 28, 9:40, 9:42, starts like that again.

10  Q.  So sometimes it records in the way that doesn't really seem

11  to make sense, but do you have any reason to believe that

12  someone other than Mr. Medina punching in at the store punched

13  in at 4:10 on March 27 or 9:49 on March 28?

14  A.  I'm trying to point the fact that -- but you reading the

15  dates, punch the time for six consecutive day doesn't mean he

16  works six consecutive days.  I was answering to that question.

17  Q.  What's the other possibility?  What's your explanation of

18  how that means anything other than he logged in and worked

19  those days?

20  A.  Until I saw Mr. Medina worked in my next door competitor, I

21  was actually going to talk to him and find out what was going

22  on.  My only theory, the way my brain work right now, the only

23  possible explanation I have is when that -- why he did this is

24  only towards the negative, he left with a hug and with a

25  handshake and served me with papers, then he started working

1    for my next door competitor a week or two after.

2    Q.  So you have no explanation of how it turns out the second

3    page here -- actually, turn to the second page.

4            You see from May 7 to May 17?

5    A.  May 7 to May 17, uh-huh.

6    Q.  Every single day there's a clock-in by Mr. Medina, correct?

7    A.  I see it here, yes.

8    Q.  And you have no explanation other than a theory that maybe

9    he downloaded the software by obtaining a license key and

10   hacked into this computer information?

11   A.  So he testified earlier that he is an eager worker, shows

12   up one hour prior to actual opening time and does everything,

13   right?  Why is the time stamp past after ten the whole time?

14   Q.  Sir, that wasn't my question.  My question is:  Do you have

15   any reason that you can offer for why Mr. Medina clocked in

16   every day May 7 to May 17 consecutively?

17   A.  Not except what I told you, no.

18   Q.  Okay.

19           THE COURT:  Off the record.

20           (Discussion held off the record).

21   Q.  Similarly, June 13, starting June 13 -- withdrawn.

22           Starting June 18 through June 27, Mr. Medina logs in

23   ten consecutive days, correct?

24   A.  Based on the time sheet right here, yes, but the time is

25   incorrect.  He's logging in at 7:00 p.m.  He's logging -- the

1   19th he logged in on 7:00 p.m., on June 23rd he logs in at 4:49

2   p.m., the day before, 4:37 p.m.  No business owner would ask an

3   employee to show up only three hours for a day, especially like

4   this in the middle of the day.  It doesn't work that way.

5   Q.  Not to belabor the point, but the Court can concern

6   certainly take judicial notice of the dates and the clock-ins

7   and clock-outs how many days there are clock-ins in a week, but

8   after reviewing these records, your testimony remains that he

9   never worked more than three full days and sometimes maybe a

10  Sunday --

11  A.  Yes.

12  Q.  -- a week?

13          And you have records of that?

14  A.  No.

15  Q.  Okay.

16  A.  That's why I'm here.

17  Q.  In addition to these time records, you testified that

18  there's another record of log ins by employees to show like who

19  made the sale, is that correct?

20  A.  Well, not who made the sale, it's a program -- it's a

21  company website called ASAP, and that's where, if I was

22  purchasing a phone, I would put in my name, my address, my

23  email, and the plan that I want, I will use that to make an

24  activation sale.

25  Q.  So someone needs to be logged in to make the sale?

HBDTMED2                    Park - cross

A.  That's the general password for everyone, one ID, one

password for that particular location.

Q.  So those records would not tell you who made a particular

sale?

A.  Not who, no.

Q.  The location -- the East Communication location in the

Bronx is not the only location that you're involved with,

correct?

A.  Yes.

Q.  You're also involved in the location in Poughkeepsie?

A.  East Communication PK, yes.

Q.  Is there another location around New Jersey or

Pennsylvania?

A.  No.

Q.  How often were you at the Poughkeepsie location?

A.  Usually there twice a week.

Q.  Who is there the rest of the time?

A.  The employee.

Q.  Just one employee?

A.  One or two.  Only depends on the season.  Poughkeepsie is

that one store, all the other stores they demand at least one

full time and the owner to be there, but Poughkeepsie for the

numbers being really slow, that's the only store they have a

waiver, verified.  I could call T Mobile right now.

Q.  Okay.  For the location in the Bronx, there was always

HBDTMED2                        Park - cross

1  supposed to be one employee and either yourself or Mr. Yo?

2  A.  Yes.

3  Q.  Isn't it true that often Mr. Medina was the only one there

4  for long stretches in the day?

5  A.  For ten hour shifts, yes.

6  Q.  So he would be by himself for full days?

7  A.  There were times, yes.

8  Q.  And that was against the Metro PCS regulations?

9  A.  Not necessarily.  There's no rule that says I have to be

10  there or Mr. Yo has to be there every single day.  It's

11  cumulative hours that actually matters.

12          And the reason I would never use Mr. Medina's ID to

13  log in is because when I'm there I log in with my credentials

14  to show them what -- they're telling me your numbers are low,

15  is it the employee problem or is it my oversight problem, that

16  I will show them one of these and say hey, I was actually there

17  more than once or twice, three times a week.

18  Q.  So you would use that log-in system to show Metro PCS and

19  it would be the ASR represents to confirm that you were there?

20  A.  Yes.

21  Q.  And again, so there would be no reason for you or Luis to

22  log in as Mr. Medina.  In fact, you would rather Metro PCS see

23  one or both of you are there, correct?

24  A.  I mean so right, it could be that, some days let's say

25  Mr. Medina did not sign out the night before, then I will walk

1   in then actually make the sale, then if I scan it, the credit

2   will go to Mr. Medina.

3   Q.   The credit where?

4   A.   Like the actual phone was sold by the particular employee

5   would go to Mr. Medina, and that's the only -- that's the

6   second explanation that I had.

7   Q.   But that's completely separate from the clock-in records,

8   correct?

9   A.   Right.  I don't understand how this -- no.

10  Q.   Isn't it true that you would ask Mr. Medina if ASR reps

11  asked if you were around that you would tell him to say yes,

12  even if you were not?

13  A.   Well, yes.  I'm five minutes away, so yeah.

14  Q.   Did you ask him to do that while you were at the

15  Poughkeepsie store?

16  A.   He was never at the Poughkeepsie store.

17  Q.   No, while you were.

18  A.   Could have maybe, because Yo was around.  If I wasn't

19  around, I made sure Mr. Yo was covering for me.

20  Q.   By covering, you mean being in the general area, is that

21  right?

22  A.   We are always working.  The company knows that.  We have to

23  replenish the phones and accessories.  Because we are not there

24  physically, they know that's part of the work.  They understand

25  that.

HBDTMED2                         Park - cross

1    Q.  But Mr. Medina would be there by himself for full days?

2    A.  The days he was instructed to work full days, yes.

3    Q.  And on those days you wouldn't know what time he actually

4    arrived at the store, correct?

5    A.  Well, I wouldn't check every single day, but one thing for

6    sure is that if there was -- if you open late, there were days

7    he was he late, but he would let me know ahead of time, so that

8    was okay, or -- there was never an official complaint made by

9    the customers saying that the store wasn't open on time while

10   Mr. Medina was supposed to work, yes.

11   Q.  So you wouldn't know if he arrives at 9:30, 9:45 or 10:00,

12   as long as --

13   A.  I don't ask him to.  You're supposed to be there at 10.  I

14   don't tell my employees to be there 35, 45 minutes prior to

15   that.  It doesn't work that way.

16   Q.  But there were things he had to do before the store opens

17   for customers?

18   A.  The reason he came in at 9:30 is because he lives far away

19   and the bus time didn't coincide with the 10 o'clock schedule.

20   That's my explanation.

21   Q.  But he did have certain duties before the store opens,

22   unlock it, turn the computers on, turn the lights on, correct?

23   A.  Computers usually, right, so it takes three minutes, tops,

24   from -- the gate is one lock combination lock, you roll it up,

25   gate goes up, you turn the key, you open the door, the alarm

HBDTMED2                          Park - cross

1    will start beeping, you punch in the four digit code, you walk

2    12 to 13 feet around the counter and you punch in saying what

3    time you came in.  Takes no more than five minutes.

4    Q.  Close of business duties.  He would regularly be

5    responsible for end of day closing up the store, correct?

6    A.  So not anyone who is past 7 who is supposed to work there

7    until the store is closing, they're instructed to lock the door

8    at 7:30 for any other issues except for sale.  For payments,

9    always come back the following day.  Any phone issues they

10   could go to different location.  So you lock the door, because

11   security issues, you count the money, you put underneath, and

12   you should be done by 8 o'clock, yes.

13   Q.  Was there anyone else who worked at the store from February

14   of 2015 until the end of November 2015 aside from Mr. Medina

15   yourself and Mr. Yo?

16   A.  Starting September, October and November, I had new

17   employees in training at the time, yes, because he informed me

18   that he was leaving.

19   Q.  Did those employees have keys to the store --

20   A.  Yes.

21   Q.  -- from the point in training?

22   A.  From training they do not have keys.  As I stated

23   previously, there are only three keys.  These are not keys that

24   I could make copies of my own, the landlord issued them to me.

25   I hold one, the landlord holds one, and Ely at the time held

HBDTMED2                         Park - cross

1    one.

2    Q.  I think you said --

3    A.  Mr. Medina.

4    Q.  -- Mr. Yo has one and Mr. Medina.

5    A.  Yes, he's the least principal owner, so I have one and

6    Mr. Medina has one.

7    Q.  Are you a part owner of the store?

8    A.  No.

9    Q.  So what exactly is your role?

10   A.  He's a -- Mr. Yo is a family friend, family friend from 30,

11   40 years ago.  I just happened to have time one week when he

12   was away in Europe, he asked me to help and I kind of liked it.

13   I liked the -- I thought I could use a second income, and

14   that's how it started in 2014.

15   Q.  And in 2015, was this your primary job?

16   A.  No.

17   Q.  You had a different job apart from the store in the Bronx

18   and Poughkeepsie?

19   A.  Yes.

20   Q.  What job was that?

21   A.  I'm a biochemist.

22   Q.  And how many days per week were you at the Bronx location

23   during that in 2015?

24   A.  Three days, four days.

25   Q.  Apart from your full-time job?

HBDTMED2                      Park - cross

```
1   A.  It's not a daytime job, sir, it's a nighttime job shift.

2   It's a research job using the machines after 10:00 p.m.

3   Q.  You were responsible for paying Mr. Medina and deciding how

4   much he's paid each week?

5   A.  Mr. Medina, yes, because I'm the one who -- I'm the one who

6   spoke to him first.  I'm the one who decided to hire

7   Mr. Medina.  I'm the one who had to convince Mr. Yo that

8   Mr. Medina was the right fit.

9   Q.  How did you determine how much to pay him each week?

10  A.  Well, based on the hours and based on the minimal wage.

11  Q.  How did you know how many hours he worked each week?

12  A.  I know there's seven days worked days a week, then Mr. Yo

13  and I would take turns, so we usually came out the Monday,

14  Wednesday and Friday schedule or Tuesday, Thursday, Saturday,

15  Sunday schedule every alternate day of the week.

16  Q.  Did you do anything at the end of the week to make sure

17  that you had a record --

18          Who had the correct accounting of hours Mr. Medina

19  worked?

20  A.  Well, when I first spoke to Mr. Medina, he informed me

21  about his special circumstance and situation.  He asked me to

22  be paid in cash.  So I know that particular week he worked 30

23  hours or 36 hours, and based on that, he will get paid.

24  Q.  You know how many hours he worked based on your

25  recollection of the days he worked and his schedule, is that
```

HBDTMED2                        Park - cross

1   correct?

2   A.  Yes.

3   Q.  Did you ever ask him to email you the hours he worked in

4   the week?

5   A.  You know, that's another funny thing, all my other

6   employees -- all my employees I have email records of it, only

7   Mr. Medina I don't have.

8   Q.  So your testimony is Mr. Medina did not email you?

9   A.  No, I searched for Mr. Medina's email, I searched my email

10  and I couldn't find anything.

11  Q.  I show you what has been marked Plaintiff's Exhibit 3.

12          Take a moment to look at this document and familiarize

13  yourself with it.  Do you see on the last page your signature?

14  A.  Yes.

15  Q.  And you signed this --

16          THE COURT:  For identification, you're referring to

17  the response to interrogatories document request, is that

18  correct?

19          MR. ANDROPHY:  Yes, your Honor.

20  Q.  And you signed this document -- turn to the last page.  And

21  above your signature you signed the statement that you have

22  read these answers and the contents are true to my own

23  knowledge except as to matters therein stated to be alleged

24  upon information and belief, and those matters I believe them

25  to be true.  Correct?

1   A.   Yes.

2   Q.   You understand that meant you were stating that these

3   answers were true, is that right?  I understand it's legalese,

4   but you understand that was --

5   A.   That's what I was signing, yes.

6   Q.   If you turn to the first page, do you see number 10?

7   Unfortunately we don't have the questions here, but I don't

8   think it's going to necessarily matter.

9         Do you see in response to interrogatory 10 it states

10  plaintiff emailed the hours he worked each week?

11  A.   Yes, I see number 10.

12  Q.   And you gave that answer honestly and truthfully, correct?

13        Was this answer correct when you gave it?

14  A.   Yes, I thought he emailed me those hours, yes.

15  Q.   Okay.  So is your testimony now that he emailed the hours

16  or he did not?

17  A.   If Mr. Medina or myself had any records of what was sent

18  back and forth, we wouldn't be here today.

19  Q.   Unless you have it and realized it's counter to your

20  version of facts, maybe that's why we are here.

21        MR. CHUN:  Objection.

22        THE COURT:  Sustained.

23  Q.   Isn't that true?

24  A.   Sir, right.

25        THE COURT:  You don't have to answer that.  Move on.

1    Q.  What did you do to see if you do have an email record of

2    his hours?

3    A.  I went to the search history -- the first thing I did when

4    I got served with the papers, I thought this is absurd.  So the

5    first logical thing is actually read it and states he worked

6    all these hours, he never got lunch break, you know, forced him

7    to work all these hours and stuff like that.  I said very clear

8    he should have emailed me the hours he worked, right?  And if

9    you look in my email, I could show it to the Court right now,

10   every employee that works for East Communication or East

11   Communication PK sends me the end of the day report.  And it

12   states the day they worked, how much money that came in.  I

13   don't have any of that from Mr. Medina.

14   Q.  Do you have that for employees before Mr. Medina?

15   A.  You know, Mr. Medina I think is the first employee we

16   hired, maybe except Collette Flores in Poughkeepsie store.

17   Q.  So you didn't require Mr. Medina to do that?

18   A.  He asked me to pay him in cash.  As long as he turned out

19   to be a trustworthy employee, I have no problem doing that.  I

20   didn't expect the repercussions of this.  If I knew all I had

21   to do was write a check for how many hours times nine, we would

22   not be here today.

23   Q.  Did you believe that because you were paying him in cash

24   you did not have to keep a record of hours he worked?

25   A.  Not necessarily, no, I didn't think -- I didn't think it

HBDTMED2                      Park - cross

1    was a big deal, as long as I knew he was being paid, no.

2    Q.  Did you understand that employers are required to pay hours

3    worked above 40 one and a half times the regular rate of pay?

4    A.  Yes.

5    Q.  Did you understand that employers are required to keep

6    written records of the hours that employees work?

7    A.  No, I didn't.

8    Q.  Did you understand in 2015 --

9    A.  Not as clear as I do now.

10   Q.  What was your understanding in 2015?

11   A.  I thought if I was paying the actual amount that the state

12   mandates, the employee could file the taxes themselves, I

13   thought it was okay.

14   Q.  Did you ever record anything in writing about how much you

15   paid Mr. Medina?

16   A.  Again, any logical person would have said something if they

17   were being shorted their money.  So he didn't say anything, so

18   there's no record being kept, no.

19   Q.  For about nine months of his employment you made no record

20   for yourself or your accountant or the business' accountant --

21   A.  No.

22   Q.  -- of how much he was being paid?

23   A.  Yes, no.

24   Q.  No records for the business to report on its tax returns

25   how much they're paying its employee?

1   A.  No.

2   Q.  I just want to make sure I'm clear about your testimony,

3   did Mr. Medina ever work more than 40 hours in a week?

4   A.  No.

5          MR. ANDROPHY:  I have no further questions.

6          THE COURT:  Mr. Chun, is there any redirect?

7          MR. CHUN:  Yes.

8   REDIRECT EXAMINATION

9   BY MR. CHUN:

10  Q.  Mr. Park, good afternoon.  I want to turn your attention to

11  the employee time sheet.  So you spent a good deal of time on

12  this and I want to spend a little more.  So with respect to the

13  entries, to the best of your knowledge, they were only made by

14  Mr. Medina, is that correct?

15  A.  Yes.

16  Q.  So the first entry, the very first one, February 24, 2015,

17  log in of 3:15:08 p.m., do you recall if you were there?

18  A.  I'm pretty sure I was there.  I'm the one who probably gave

19  him the log ins and passwords and probably said try it, this is

20  how you log in, this is how you log out.

21  Q.  And February 26 is the log out time for 03, approximately

22  49 hours later, and you say something about okay, you could

23  download the key and then access it via remote location?

24  A.  Yes.

25  Q.  If that was the case, wouldn't it still come up as an

1    entry?

2    A.   Yeah, right.  I don't know.  For this particular time,

3    yeah, I don't know.  So he signed on, he punched in, and this

4    particular time he did not punch out until the following day,

5    yes.

6    Q.   Okay.  Thank you.  And now let's turn to the very last

7    entry, 11/28, 2015, that was the last day he worked, right?

8    A.   Yes.

9    Q.   That there was punch in at 11:02 and no clock-out date?

10   A.   Right.

11   Q.   Do you know, were you there on the last day when he was

12   there?

13   A.   Most likely I was there, yeah.  I was there because I

14   remember giving out fliers to the two new girls I hired, yes.

15   Q.   And did you ever experience -- from February to

16   November 2015, did you ever experience personally any problems

17   with the log-in and log-out procedure?

18   A.   No.

19   Q.   Now you said your hours are -- the hours are 10 to 8 --

20   A.   Yes.

21   Q.   -- Monday through Saturday?

22   A.   Yes.

23   Q.   Now I used to be an employee, too, so for me, 10 o'clock

24   would mean I would show up at 10 o'clock.

25           MR. ANDROPHY:  Objection.

HBDTMED2                    Park - redirect

1           THE COURT:  Is there a question?

2           MR. CHUN:  Yes, there is.

3   Q.  What time was Mr. Medina required to come to work?

4   A.  At 10.

5   Q.  And if it took him 30 minutes to open the store, he would

6   be paid for those 30 minutes, is that correct?

7   A.  Yes.

8   Q.  Okay.  Store closes at 8.  Does that mean that everything

9   has to be locked out and the employee is out the door at

10  8 o'clock?

11  A.  No.

12  Q.  Or does that mean that everything is finished at 8 o'clock

13  and then the lock-out procedure, then the closing procedure

14  takes place?  What does 8 o'clock mean?

15  A.  8 o'clock means the store -- I would like the gate to be

16  down at 8 o'clock unless a customer comes in and really wants

17  to buy a phone, because the other Metro PCS stores close at 7

18  but the one nearby.  So it was our business way of increasing

19  revenues that we'll close one hour after everybody else, that

20  would generate more revenue.

21  Q.  But closing means that everything is wrapped up so that at

22  8 o'clock we're out the door?

23  A.  Right.

24  Q.  Okay.  Did you receive any emails -- do you recall

25  receiving any emails from Mr. Medina?

HBDTMED2                     Medina - direct

1   A.  I searched, pretty much went into or three years, and it

2   was a year back at this time.  I checked, nothing.

3   Q.  Did you ever sign anything from Mr. Medina --

4   A.  No.

5   Q.  -- when you paid?

6   A.  Right, so when he takes the money, when I handed the money

7   myself, I am looking at the money being transferred.  In my

8   eyes, it was okay.  When Mr. Medina took money out of the

9   register, on a little white piece of paper, Ely, the date, and

10  the amount he took and put it inside the register.

11  Q.  But did you sign anything for the times that you gave him

12  money?

13  A.  No.

14          MR. CHUN:  Thank you, nothing further.

15          THE COURT:  Thank you very much.  You may step down.

16          Do you have any other witnesses?

17          MR. CHUN:  I do.  I would actually like to call

18  Mr. Medina.  I only have two questions.

19          THE COURT:  Okay.

20          DEPUTY CLERK:  Just remember you're still under oath.

21          (Continued on next page)

22

23

24

25

1    ELY MEDINA,

2        having been previously sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. CHUN:

5    Q.  Mr. Medina, in the year 2015, did you receive disability?

6    A.  No, sir.

7    Q.  And for the tax year 2015, did you file an income tax

8    return?

9            MS. ISAACSON:  Objection.

10   A.  I'm not sure.

11           MR. ANDROPHY:  I have nothing.

12           MS. ISAACSON:  We move to strike the answer.

13           THE COURT:  On what basis?

14           MS. ISAACSON:  Anything about Mr. Medina's tax filing

15   is not relevant and they're forbidden in these cases to be

16   discussed.

17           THE COURT:  I'm going to allow it and take it under

18   advisement at this point.

19           MR. CHUN:  I have nothing further.

20           THE COURT:  Thank you.

21           Do you have any other witnesses, Mr. Chun?

22           MR. CHUN:  No.

23           THE COURT:  Do you rest at this point?

24           MR. CHUN:  The defense rests.

25           THE COURT:  Do you have any rebuttal?

1          MS. ISAACSON:  No, your Honor.

2          THE COURT:  So we can move to closing statements at

3   this point.  If you want to make a brief close arguments,

4   that's fine.  Do you want to go first?

5          MS. ISAACSON:  Could we have a ten-minute break, your

6   Honor?

7          THE COURT:  Sure.

8          (Recess taken)

9          THE COURT:  Mr. Chun, would you like to go first?

10         MR. CHUN:  Yes.  May it please the Court.

11         We have wrapped up with the documents, with the

12   testimony, fair Labor Standards Act, pretty self-explanatory.

13   This is my first trial handling this matter.  I know some

14   basics about trials, this type of thing.  The plaintiff has a

15   burden to prove about payments, about hours, what was paid and

16   what was not paid.  You don't have any time logs, you don't

17   have any entries.  In fact, the Court has admitted testimony

18   from the plaintiff no records from start of employment through

19   end of August.

20         Does my client -- should my client have records?  Easy

21   answer is yes for everything.  We learned that in law school.

22   Rule number one, get it in writing.  Rule number two, get it in

23   writing.  Didn't happen.  We know that.  He was paid the minute

24   he started saying I'm working five hours more and I'm not

25   getting paid for that.  Okay.  So he let that go for a week,

HBDTMED2

Mr. Medina, let that go for two weeks, three weeks, gets up to ten weeks.

Reasonable people know two things, when they're not getting paid, they know better than the employer they're not getting paid, and they're going to make a statement about that. And number two, when there's an electronic punch card time in and time out, the first thing you're going to do is punch in because you want to make sure you don't lose even an extra minute to locking up, opening up the doors.

Common sense, reasonable person says that he should have been paid what he worked, and he did.  You're hearing two totally different stories.  One is the plaintiff stating that he worked 45 hours, and in fact, one week at the end of September, based on temperature, he worked 70 hours, more than the store is even open.  The store is only open 66 hours.  He worked every single hour plus four.

My client knows about the overtime laws.  He stated as such.  And he knows that, as employers, it's better to -- it's preferred not to pay overtime as opposed to overtime for obvious reasons.  My client was told when he was going to be -- when he was supposed to pay by the plaintiff, pay it, right there, end of discussion.  Nothing further.  You didn't hear anything about Mr. Medina, oh, I think I'm doing a good job, I think I deserve a raise or I think I deserve more hours.  No, you heard my client specifically state three days a week, plus

HBDTMED2

a Sunday, either Monday, Wednesday or Friday or Tuesday,
Thursday, Saturday, and a Sunday if it was required.  That only
adds up to 30 -- to 36 hours.

         Mr. Medina, after working February, March, April, May,
June, July, August, now decides to make a record log of what he
worked.  He never testified anything -- you heard my client
state from August he was gone for two weeks, Mr. Medina was.
No records, no payments.  Didn't work.  Now you're seeing all
of these handwritten entries that were made one week at a time.

         So it wasn't brought out, but he worked seven days and
recounted all the seven days.  You notice on his own ledger a
very interesting note, the last entry he makes, November 28,
2015, he worked ten hours, okay, then started to put down
eleven again, as if there's another date.  Now he's saying oh,
I didn't work another day, so I don't have to put it in, but
meanwhile he already started to write down for the next day
after a date that he didn't work.

         Why do I mention all this?  It's difficult to remember
specifically from seven days ago and the laws of the State of
New York, and I guess also for the Federal Rules of Civil
Procedure you want to make sure that your records are entered
pretty contemporaneously.  I can't even remember what the
weather was for the last seven days.  And Mr. Medina is going
to recall what he did in the hours that he worked?  This is too
much of a discrepancy, saying 45, 50, later on towards the end,

HBDTMED2

September and October, up to 70 hours, 61 hours that he was
working.

My client not even unreasonable, but it would be
foolish for my client to ever say to him you worked 61 hours,
I'm only go pay you 45 or 40.  There's got to be some sort of
discussion when it comes to working more than twice the hours
that were originally set.

We don't believe that Mr. Medina has really
established to satisfy the claims that he makes for the relief
that he seeks.  There's been no testimony regarding -- the
wages and the overtime are his big claims.  There's been no
testimony presented about other claims, such as improper work
procedures being placed.  That's part of the complaint.  No
testimony on behalf of plaintiff, none asked on
cross-examination.

You have Mr. Medina, who says he worked, he put in the
hours, he was paid.  He didn't have any problems in the
beginning.  He started to have any problems, he then had a
discussion with Mr. Park sometime in April, agreed that okay,
there's a dispute, so this is going to be the amount.

The time records my adversaries are trying to say
they're so out of whack that we can't -- we don't know anything
about anything.  Well, we do know that you can punch in and you
can punch out, and if you have a problem with one of those,
you're going to see -- you're going to talk to some sort of

HBDTMED2

1  supervisor to make sure your time records are kept carefully

2  because you want to get paid properly.  He didn't do that for

3  nine months.  Even his last day he didn't even punch out

4  because he didn't know to.  He didn't say it was malfunctioning

5  that day either, but it doesn't matter.

6         We have a lot of -- the burden for Mr. Medina to prove

7  we don't believe -- we truly believe that hasn't been met.  My

8  client, he stated what he had to state.  We believe that he

9  made all the payments that were required.  We believe

10  Mr. Medina did not show enough proof.  He did not say here's my

11  tax return for all the money that I made.  He didn't present

12  any bank statements, any account records for any of the monies

13  that he did.  Why?  Because it's in cash.  And cash money is

14  fungible, it can't be traced.  I learned that in law school.

15         So we have a situation here where we have an employer

16  that paid cash and an employee took cash, so nobody really

17  knows anything.  And he will start saying I believe I worked 45

18  hours, probably I worked 45 hours to 40 hours.  He would have

19  known, and if the Court is going to believe his testimony, he

20  would know now that 40 hours plus triggers something.

21         In addition of what my client paid, I looked up the

22  New York State minimum wage at the time was 8.75 for 2015, and

23  the federal I believe was a little lower.  So my client was

24  within the range.  Didn't give him a 1099, but I guess

25  Mr. Medina will gladly accept the 1099 now for the money that

HBDTMED2

1    he was paid and wasn't reported.

2            My client in these types of cases is looks upon as the

3    bad person.  I can understand that.  But I can also understand

4    it takes two to tango, so Mr. Medina definitely, definitely has

5    some blame here.  And he didn't have anything to back up what

6    he says from February through the end of September, has

7    absolutely nothing, and even stated that he was paid.

8            So we have calculations here based on figures that

9    were just created; nothing was really shown to dispute the fact

10   that he worked more than 36 hours, as my client even stated,

11   one or two occasions, where he was paid overtime.

12           We don't believe that the burden has been met.  We

13   don't believe that also the relief sought should be granted,

14   and we would ask that the complaint and the summons be

15   dismissed.  We know that here this is just simply an attempt to

16   try to collect more money.  Why not?  He has nothing to lose.

17   He is going to claim he's judgment proof, my client will end up

18   spending his time here and trying to collect on nothing.

19           So what we have here is a clear case of well, let's

20   try to grab something; if we don't, we're in the same position

21   we are before we started, which is with nothing.  So we ask the

22   Court to take into consideration highly the testimony, the

23   documents, especially the time sheets, and the demeanor, the

24   cross-examination of both of the witnesses, and we believe that

25   it should be a defense verdict.  Thank you very much.

HBDTMED2

1        THE COURT:  Thank you.

2        MS. ISAACSON:  Thank you, your Honor.

3        The heart and soul of our labor laws is the

4   recognition that any time an employee who works in excess of 40

5   hours within a week, our legislature and our courts

6   consistently and adamantly require we treat those extra hours

7   as special by requiring employers, absent certain exceptions,

8   to pay a premium for every hour worked over 40.

9        In order to protect an employee's right to extra

10  compensation for these special hours over 40, our federal and

11  state legislators have enacted a very strict regime that places

12  a substantial burden not on the employee but on the employers

13  to record the manner in which they pay their employees and the

14  hours that they suffer those employees to work.

15        The defendants continuously argued in their closing

16  statements that the burden is on the employee, but the employer

17  was required to maintain records of the hours that Mr. Medina

18  worked as well as the pay that they gave him.

19        Today you heard two completely different stories.

20  However, Mr. Medina's story is supported by the time records,

21  both the ones that he submitted to the Court and the records

22  that the defendants have produced.  The defendants claim that

23  Mr. Medina worked three and a half days each week that he

24  worked at East Communication, but that is completely

25  contradicted by the time records that they maintained.

HBDTMED2

1              Mr. Medina himself kept records, even though he had no

2      legal obligation to, because the employers failed to do their

3      legal obligations.  Mr. Park said in his testimony that

4      Mr. Medina worked 46 hours on certain occasions, but then he

5      stated he never worked over 40 hours.

6              In addition, Mr. Park stated that it wasn't a big

7      deal, and that he never looked at the time records even though

8      he had them in place.

9              He also stated at times it was too complicated to

10     figure out exactly how many hours Mr. Medina actually worked

11     there to do the calculations he's obligated to do under the

12     law.  The defendants have virtually maintained no records of

13     Mr. Medina's employment at East Communication despite their

14     legal obligation.

15             In addition, we also learned that defendants failed to

16     provide adequate wage notices and wage statements as required

17     by New York State labor laws, and in fact the defendants failed

18     to give Mr. Medina any document throughout his employment

19     there.

20             Based on the testimony today as well as all the

21     records that have been submitted into evidence, I believe you

22     will find that there were plain violations of both the Fair

23     Labor Standards Act and New York labor law.  Thank you.

24             THE COURT:  Thank you.

25             So at this time I'm going to deny defendants' motion

HBDTMED2

1   to dismiss the complaint and the summons, and I will take the

2   fair labor and employment claims under advisement and will be

3   issuing an opinion soon.

4           Thank you.

5           (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25